**BOWLES v. MAHONEY.**

**DISTRICT OF COLUMBIA v. MAHONEY.**

Nos. 10934, 10935.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 28, 1951.

Decided July 10, 1952.

Appellee's Petition for Rehearing Denied Sept. 12, 1952.

Writ of Certiorari Denied Feb. 9, 1953.
See 73 S.Ct. 505.

Cornelius H. Doherty, Washington, D. C., for Sarah Edna Bowles.

Chester H. Gray, Principal Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom Vernon E. West, Corp. Counsel, Oliver Gasch and Hubert B. Pair, Assts. Corp. Counsel, Washington, D. C., were on the brief, for District of Columbia.

Andrew W. Carroll, Washington, D. C., for appellee.

Before KIMBROUGH STONE, Circuit Judge, retired (sitting by designation), and WILBUR K. MILLER and BAZELON, Circuit Judges.

### WILBUR K. MILLER, Circuit Judge.

The appellant, Sarah Edna Bowles, is the owner of a parcel of ground at 2320 H Street, N. W., in the District of Columbia. The lot is some 6 feet higher than the level of the traveled portion of H Street, and the residence thereon extends to the front property line. In front of the house the publicly owned "parking"[1] rises somewhat abruptly from the front sidewalk so that a flight of nine steps is required to reach the front door from the sidewalk—a distance at street level of about 20 feet. Thus the parking in front of the residence is a rather high sloping bank of earth between the sidewalk and the property line, which seems to the passerby to be the front yard of the residence Technically, however, the parking is a part of the street owned by the United States and controlled by the District of Columbia.

---

1. This word is used to describe the portion of the street which lies between the sidewalk and the property line.

On one side, the dwelling at 2320 H Street is attached to the house on the adjoining lot. Along that side line of the property is a passageway 2½ feet wide which extends from the front sidewalk through the parking and under the house through a tunnel-like opening. This passageway, which gives access from the sidewalk to the rear of the premises is on the level of H Street. From the sidewalk to the house, the passageway is protected from the sloping bank of the remainder of the parking by a brick retaining wall which rises with the slope of the bank until it reaches, at the house, a height of about 6 feet. A permit for the erection of the retaining wall in the parking was issued by the District of Columbia on February 18, 1896. It may be presumed that the then owner of the property at 2320 H Street constructed the wall soon after that date.

On December 15, 1936, B. F. Saul Company, apparently the renting agent for the owner, Mrs. Bowles, leased the entire premises at 2320 H Street to one Luke Gaither. The lease, a copy of which is in the record, does not obligate the landlord to make repairs. There is no statute imposing that duty on a landlord. Gaither's sister, Mrs. Helen Armstrong, who had lived in the house some years before the date of the lease, continued thereafter to occupy it with her brother. On March 30, 1948, Mrs. Armstrong's son, Ralph Mahoney, who was then 7 years old and who lived at 2320 H Street with his mother and uncle, was at play in the passageway above described at a point perhaps half way between the property line and the front sidewalk, which was therefore in the area known as the parking. A portion of the retaining wall collapsed and struck him, inflicting serious injuries.

Through his mother as next friend, the child brought this tort action against Mrs. Bowles, the owner of the property, and against the District of Columbia. It was alleged in the complaint that Mrs. Bowles

erected the brick retaining wall in the publicly owned parking with the knowledge and consent of the District of Columbia

"* * * for the enhancement of value and benefit of premises 2320 H Street, N. W. owned by defendant, Sarah Edna Bowles.

"That as the result of the defendant's[2] negligence and failure to keep said wall in good repair, on March 30, 1948, the said wall fell, collapsed and crumbled upon the plaintiff, Ralph Mahoney, while the plaintiff was using the aforesaid abutting and adjoining sidewalk for a lawful and proper purpose."

Thus the plaintiff's theory is seen to be this: Mrs. Bowles, having constructed the wall in the parking for the benefit of her property, was under a duty to maintain it in a safe condition; she violated her duty by negligently failing to keep the wall in repair; as a result of her negligence the wall collapsed and injured tenant's invitee; she is therefore liable in damages to the invitee. The District of Columbia, says the complaint, permitted the structure to be erected, and negligently failed to keep it in repair.

Mrs. Armstrong testified at the trial that two years before the accident she had noticed a crack in the retaining wall[3] which she attributed to an explosion which had occurred in a nearby electric "sewer." Although she did not regard the condition as dangerous, she informed B. F. Saul Company that the wall had cracked and was told it would not be repaired. No notice of the crack in the wall was given to the District of Columbia. Mrs. Armstrong said that on previous occasions B. F. Saul Company had caused minor repairs to be made to the premises. There was no other evidence tending to show what caused a portion of the wall to fall. Mrs. Armstrong, who at the time was seated at the front window of the house, said she saw the wall suddenly collapse. Ralph's aunt testified to the same effect.

2. The use of the singular "defendant's" probably was a typographical error in the complaint. We suppose the plaintiff intended to charge both defendants with negligence.

3. In a deposition given on February 12, 1949, she fixed the time as 6 months before the accident.

The defendants' motions for a directed verdict, made at the conclusion of the plaintiff's evidence, were denied. Mrs. Bowles stood on her motion and introduced no evidence. The District of Columbia proceeded with proof, and at the end of all the evidence both motions were renewed and again denied. Over the objection of the defendant, the trial judge instructed the jury on the doctrine of *res ipsa loquitur*.[4] Having been so instructed, the jury found for the plaintiff child in the sum of $2,500.00 against both defendants. These appeals are from the judgment entered pursuant to the verdict. Both defendants complain of the District Court's failure to direct a verdict in their favor and of the instruction on *res ipsa*. The District of Columbia assigns other related errors.

■ *As to Mrs. Bowles.* Judge Groner, speaking for this court in Harrison **v.** Mortgage Inv. Co., 1932, 61 App.D.C. 155, 156, 58 F.2d 881, 882, said, "before the owner of the premises can be held liable [for injuries due to a defect therein], there must be a failure on his part to perform a duty which the law imposes." We must therefore ascertain whether Mrs. Bowles owed the child the duty of maintaining the wall in good repair.

■ The plaintiff, Ralph Mahoney, was living in the house at the invitation of his uncle, who was Mrs. Bowles' tenant, so he was using the appurtenant passageway as the tenant's invitee. The rule is that the duties and liabilities of a landlord to persons on the leased premises by the invitation of the tenant are those owed to the tenant himself. Fraser v. Kruger, 8 Cir., 1924, 298 F. 693. It follows that Mrs. Bowles is not liable for the child's injuries unless she would have been liable to her tenant, Luke Gaither, had he been injured under similar circumstances.

■ We have seen that Mrs. Bowles had not agreed to repair or maintain the demised premises. It is not suggested that she fraudulently concealed from Gaither, at the time the lease was executed, a defect in the retaining wall which was known to her and not to him; in fact it is not suggested that the wall was defective when the lease was made in 1936. The first indication of a defective condition was the crack in the wall which Mrs. Armstrong noticed in 1946. So, if the crack indicated a defective condition, it was one which arose during the term of the lease. Absent any statutory or contract duty, the lessor is not responsible for an injury resulting from a defect which developed during the term. Johnson v. Kurn, 8 Cir., 1938, 95 F. 2d 629, 632.

We said in Security Savings & Commercial Bank v. Sullivan, 1919, 49 App.D. C. 119, 120, 261 F. 461, 462:

"* * * It is settled law that where the owner of premises, by lease, parts with the entire possession and control of the premises, and the tenant, either by express provision of the lease or by the silence of the lease on that subject, assumes liability for the keeping of the premises in proper re-

4. That portion of the charge is as follows:

"Now, the evidence in this case is not clear as to why that wall fell and, therefore, the Court at its own instance is instructing you as follows:

"The Court instructs the jury that the plaintiff relies upon the rule of law known as res ipsa loquitur, that is, the thing speaks for itself. It is the law that where a thing which causes injury without fault of the injured person, is shown to be under the control of a defendant, and the injury is such as in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of some satisfactory explanation from a defendant, that the injury arose from want of the defendant's care under the

circumstances. It simply means that if there is nothing to explain or rebut the inference that arises from the way in which a thing happened, you might possibly conclude under those circumstances that it may have been occasioned by negligence; that the facts of the occurrence may warrant the inference of negligence not that it compels such an inference and you are so instructed, but it offers evidence of a circumstantial character of the existence of negligence where direct evidence may be lacking and that evidence is to be weighed by you. If you find that a defendant has not offered a reasonable explanation to rebut the inference of negligence, then your verdict must be for the plaintiff, Ralph Mahoney."

pair, the tenant, and not the owner, will be liable in case of an accident due to negligence in allowing the premises, or any portion thereof, to get out of repair."

To recapitulate: Mrs. Bowles was not guilty of fraud or concealment by failing to disclose, at the time of leasing, defects in the wall of which she had knowledge; she had not agreed to repair; she had conveyed entire possession and control of the premises, including the appurtenant passageway and retaining wall, to Luke Gaither. We conclude that Gaither took the premises and appurtenances thereto as they were in 1936, and assumed whatever risk there might have been in occupying them. It was his duty to maintain the wall in good condition. Mrs. Bowles, therefore, would not have been liable to Gaither had he been injured when the wall collapsed on March 30, 1948. Lawler v. Capital City Life Insurance Co., 1933, 62 App.D.C. 391, 68 F.2d 438; Fraser v. Kruger, supra. Since the plaintiff, being the invitee of the tenant, stood in his right,[5] Mrs. Bowles owed him no duty and is not liable for his injury.

The fact that B. F. Saul Company had caused repairs to be made to the premises did not obligate Mrs. Bowles to continue to make them and did not make her a covenantor to repair. Shegda v. Hartford-Connecticut Trust Company, 1944, 131 Conn. 186, 38 A.2d 668; Ginsburg v. Jacobson, 1931, 276 Mass. 108, 176 N.E. 918; Potter v. New York, O. & W. R. Co., 233 App.Div. 578, 253 N.Y.S. 394, affirmed, 1933, 261 N.Y. 489, 185 N.E. 708.

In the foregoing, we have treated the case as though the accident had occurred on the premises owned by Mrs. Bowles and leased to Gaither. That the child was injured in the parking area and not on the premises proper, we regard as immaterial for the reason that Mrs. Bowles owed Gaither no greater duty with regard to maintaining the wall in the parking than

with respect to keeping the actual premises in repair. As to the latter, we have seen she owed him no duty at all.

Concerning the area known as the parking and the abutter's legal relation to it, this court said in Allman v. District of Columbia, 1894, 3 App.D.C. 8, 17:

"* * * The 'parking' of some twenty feet in width intervening between the building and the sidewalk is a part of the scheme for street improvement adopted generally in the city of Washington. But whilst the maintenance of this space, free from building, is, in a measure, for the public convenience and benefit, it is not for the general use of the public, cannot be occupied or obstructed for such use, and is really a private easement of the adjoining owner."

Since the parking area is not a thoroughfare and is not for the general use of the public, the retaining wall was not erected to serve any public purpose, but, as the plaintiff pleaded in his complaint, was built for the benefit of the premises at 2320 H Street. The retaining wall and street-level passageway over the parking were and are appurtenances to those premises. They were not and are not appurtenances for the use of the general public, as were those involved in Altemus v. Talmadge, 1932, 61 App.D.C. 148, 58 F.2d 874, but were for the use and convenience of the tenant and his invitees in reaching the rear of the leased premises. No other person had any occasion to use the passageway. The lease of the entire premises to Luke Gaither carried with it the appurtenant wall and passway and the entire private easement in the parking. That being true, the question whether Mrs. Bowles could be made liable for the child's injuries is to be determined by the same rules which would govern had the accident occurred on the premises actually owned by her.

It follows from what has been said that the trial judge erred in denying Mrs.

5. Judge Groner said, in Harrison v. Mortgage Inv. Co., 1932, 61 App.D.C. 155, 156, 58 F.2d 881, 882; "* * * She [the injured child] was using the premises in the right of her parents as tenants, and if the circumstances are such that they cannot recover, neither can she."

Bowles' motion for a directed verdict at the conclusion of the plaintiff's evidence.

■ *As to the District of Columbia.* The District had control of the publicly owned parking which was servient to the private easement therein enjoyed by the owner of 2320 H Street. The local authorities permitted the owner to erect the wall at his own expense. As between the owner of the premises and the District, there can be no doubt that the former had the duty of maintaining the retaining wall in good repair. When Mrs. Bowles conveyed the property and its appurtenances to Gaither, she transferred to him, and he assumed, that primary duty of keeping the wall safe. So, if Gaither had been injured by the collapse of the wall due to his own negligent failure to repair it, it would hardly be said he could recover from the District. The child had no greater right against the District than Gaither would have had in similar circumstances. The trial judge should have peremptorily instructed the jury to return a verdict in favor of the District of Columbia.

This conclusion makes it unnecessary for us to consider whether it was the District's duty to make regular inspections of the wall, and whether it had constructive notice of the defect in time to have caused repairs which would have prevented the accident. Nor is it material that the court erroneously included in its charge to the jury an instruction on *res ipsa loquitur.*[6]

The cases will be remanded to the District Court with instructions to set aside the verdict and the judgment entered thereon, and to enter judgment in favor of both defendants.

Reversed and remanded.

BAZELON, Circuit Judge (dissenting).

The key to the decision of the court, relieving both the landlord and the District of Columbia[1] from liability, lies in its adherence to the rule at common law that "[a]bsent any statutory or contract duty, the lessor is not responsible for an injury resulting from a defect which developed during the term."[2] I think that rule is an anachromism which has lived on through stare decisis alone rather than through pragmatic adjustment to "the felt necessities of [our] time." I would therefore discard it and cast the presumptive burden of liability upon the landlord. This, I think, is the command of the realities and mores of our day.

Courts have gradually recognized, at least in part, that the exalted position which the landlord held at early common law[3] is discordant with the needs of a later day. At early common law a lessee was regarded as having merely a personal right against the lessor.[4] But as a result of several remedies that were created in the lessee's favor,[5] he came to be regarded as having rights in rem,[6] and the lease "was regarded as a sale of the demised premises for the term."[7] Upon this thesis, the courts held that a lease was "like the sale of specified personal property to be de-

---

6. In a case such as this, that instruction is apppropriate only when the defendant had exclusive control of the premises where the accident occurred. In San Juan Light Co. v. Requena, 1912, 224 U.S. 89, 98, 32 S.Ct. 399, 56 L.Ed. 680, the Supreme Court said the doctrine of *res ipsa* is "* * * when a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care."

1. As I understand the court's opinion, the District of Columbia's non-liability arises from the same rule which places responsibility on the tenant himself.

2. Majority opinion, p. 6.

3. Harkrider, Tort Liability of a Landlord, 26 Mich.L.Rev. 260, 261 (1928).

4. 2 Pollack & Maitland, The History of English Law 106 et seq. (2d ed. 1923).

5. For example, writ of ejectment.

6. Digby, An Introduction to the History of the Law of Real Property 174–6 (4th ed. 1892).

7. Harkrider, Tort Liability of a Landlord, 26 Mich.L.Rev. 260, 261 (1928).

livered"[8] and applied the same concept of *caveat emptor* that prevailed generally in that day with respect to the sale of all chattels. As a corollary of this concept, courts generally held that the "destruction or any depreciation of [the] value [of the leased premises], other than such depreciation occasioned by a fault of the lessor, was entirely the loss of the lessee."[9]

"[B]oth the English and the American law have broken almost entirely away from the ancient rule of *caveat emptor*,"[10] with respect to the sale of chattels generally. To some extent this development has been reflected in the law governing landlord and tenant relations. For example, now "the lessor, like a vendor, is under the obligation to disclose to the lessee [not only] concealed dangerous conditions existing when possession is transferred, of which he has knowledge * * *" but also any "information [in his possession] which would lead a reasonable man to suspect that the danger exists * * *."[11] But with respect to the landlord's responsibility for the condition of the premises during the term of the lease, courts have failed to reflect this development. As a result, the common law in this respect still lags behind the modern notion that in general one who sells an article is presumed to warrant that it is good for the purpose for which it is sold. In order to keep pace, the law should recognize that when one pays for the temporary use of a dwelling, the parties contemplate that insofar as reasonable care on the part of the owner can assure it, the dwelling will be safe and habitable, not only at the time of possession is delivered but throughout the period for which payment is made. It is fair to presume that no individual would voluntarily choose to live in a dwelling that had become unsafe for human habitation. The community's enlightened self-interest requires the same presumption. It follows that, at least in the absence of express provision to the contrary, a landlord who leases property should be held to a continuing obligation to exercise reasonable care to provide that which the parties intended he should provide, namely, a safe and habitable dwelling. Applying this view to the circumstances of the present case, the landlord would be liable for the injuries to little Ralph Mahoney as the tenant's invitee. For the lease did not expressly make the tenant responsible for repairs and there is no doubt that the owner of this dilapidated dwelling[12] failed to exercise reasonable care to prevent the collapse of the cracked retaining wall. And since the court's reason for excusing the District of Columbia from liability is that the tenant, and not the landlord, had the duty to repair, that reason would no longer be valid.

One writer has suggested that the rule at common law was evolved at a time when, for the most part, leased property consisted of farm lands and the dwellings thereon were only a minor consideration. But, he said,

"One has merely to consider at the present time the number of crowded tenement houses in cities, which are in many cases occupied by people who are so poor that they are unable to care for themselves, to see the desirability of the landlord's being obliged to keep such buildings from falling into a state of decay and dilapidation. This affords but a striking example of the changes resulting from the growth of cities and the establishment of new living conditions under which the landlord's relation to the leased premises remains naturally intimate and his duty to make repairs apparent."[13]

8. Church, C.J., in Becar v. Flues, 1876, 64 N.Y. 518, 520.

9. Harkrider, Tort Liability of a Landlord, 26. Mich.L.Rev. 260, 261 (1928). "It has been said that there is no more reason for holding the lessor liable for damages resulting from a defective condition of the premises than there is for holding the grantor of a fee simple estate liable to his grantee." Id. at 263.

10. Prosser on Torts 666 (1941).

11. Prosser on Torts 650–51.

12. This condition of the leased premises is apparent from the photographs included in the record. Plaintiffs' Exhibits Nos. 1–A, 1–B, 1–C.

13. Note, 7 Cornell L.Q. 386, 388 (1922).

Two reasons have been advanced to justify perpetuation of the rule at common law under modern day conditions. First, it is said that the tenant should bear the responsibility for repair during the term of the lease because his control and possession of the premises give him the opportunity to know their condition, whereas the landlord has no such opportunity. This reason might have some validity if the landlord had no right to go upon the premises. But if the landlord is presumed to have the duty to repair, then the concomitant right to enter upon the premises for inspection and repair would be necessarily implied. And, in any case, the landlord can always reserve the right to enter the premises in order to inspect and repair them. Indeed, the case at bar shows that the landlord did enter to make repairs from time to time, not that he was ever refused such entry. And insofar as "notice" is the reason for the rule, it bears emphasis that the landlord had specific notice of the defect which caused the injuries in this case.

The second and a more sophisticated reason for relieving the landlord from liability is the hypothesis that "it is still socially desirable not to discourage investment in and ownership of real estate, particularly private dwellings." [14] This objective may well be desirable. But it is a fallacious oversimplification to suppose that the common law rule has much to do with the rate of investment in real property.[15] On the other hand, it seems clear to me that the rule operates to defeat the interests of utility and justice. "Upon whom is the loss to be placed, more justly than upon the landlord? Upon the tenant who, because of his poverty * * * risks his own neck to live in the house? Upon the tenant's equally poor guest, the mailman, the visiting nurse, etc.?" [16] Courts are not impervious to the unequal bargaining position of the parties in interpreting their agreements. For, as Mr. Justice Cardozo said, "Rules derived by a process of logical deduction from pre-established conceptions of contract and obligation have broken down before the slow and steady and erosive action of utility and justice." [17] This court illustrated that in Kay v. Cain,[18] where we said that " * * *. it is doubtful whether a clause which did undertake to exempt a landlord from responsibility for such negligence would now be valid. The acute housing shortage in and near the District of Columbia gives the landlord so great a bargaining advantage over the tenant that such an exemption might well be held invalid on grounds of public policy." There is no reason to adopt an inconsistent view where, as here, the dwelling constitutes the entire premises and there is no clause expressly exempting the landlord from liability.

In a great many states,[19] the common law rule to which the court adheres in this case has been changed by statutes based upon a recognition of its social and economic undesirability. For example, in explanation of the statute changing the rule in California, the Commissioner's note states,

"This section changes rule upon this subject to conform to that which, notwithstanding steady judicial adherence for hundreds of years to adverse doctrine, is generally believed by unprofessional public to be law, and upon which basis they almost always contract. The very fact that there are repeated decisions to the contrary, down to the year 1861, shows that the public do not and cannot understand their justice, or even realize their existence.

14. Eldredge, Landlord's Tort Liability for Disrepair, 84 U. of Pa.L.Rev. 467, 490 (1936).

15. For an outline of some of the economic considerations, see Shulman & James, Cases and Materials on Torts 588–9 (1942).

16. Id. at 587–8.

17. Selected Writings of Benjamin Nathan Cardozo 148 (Hall Ed. 1947).

18. 1946, 81 U.S.App.D.C. 24, 25, 154 F.2d 305, 306.

19. Some of these statutes are collected in Harkrider, Tort Liability of a Landlord, Part II, 26 Mich.L.Rev. 383–91 (1928); see also Shulman & James, Cases and Materials on Torts 589–91 (1942); Prosser on Torts 650 (1941).

328

So familiar a point of law could not rise again and again for adjudication were it not that the community at large revolt at every application of the rule."[20]

It may be fairly asked, should not the courts of the District of Columbia await a congressional change of this rule? Mr. Justice Sutherland provided the answer to this query in Funk v. United States,[21] when he said, "It may be said that the court should continue to enforce the old rule, however contrary to modern experience and thought, and however opposed, in principle, to the general current of legislation and of judicial opinion it may have become, *leaving to Congress the responsibility of changing it.* Of course, Congress has that power; but, if Congress fail to act, as it has failed in respect of the matter now under review, and the court be called upon to decide the question, is it not the duty of the court, if it possess the power, to decide it in accordance with present-day standards of wisdom and justice rather than in accordance with some outworn and antiquated rule of the past?" He went on to point out that " 'This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law. * * * And as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system

will mould and shape it into new and not less useful forms.' [22] "

There is no fixed line dividing the sphere of action as between the legislature and the courts for effecting needed change of a common law rule. The line should not be marked in accordance with "metaphysical conceptions of the nature of judge-made law, nor by the fetish of some implacable tenet, such as that of the division of governmental powers, but by considerations of convenience, of utility, and of the deepest sentiments of justice." [23] "Change of this character should not be left to the Legislature." [24] "If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors." [25]

It is undoubtedly true that many landlords have shaped their conduct in reliance upon the rule which I would discard. This consideration is entitled to some weight. But, in my view, it cannot outweigh the social and economic need for shifting the distribution of the risk. To those landlords who have acted in good faith there may undoubtedly be some hardship. But in our realistic experience, they are possessed of the better means to discharge this burden. We need give slight consideration to other landlords who would employ the rule to press their advantage to the extent of permitting a known hazard to exist in callous disregard of the safety of fellow human beings who are obviously without the means to protect themselves.

20. Kerr's Cyclopedic Codes of California 2232, § 1941 of Civil Code, note 17 (1920).

21. 1933, 290 U.S. 371, 381–382, 54 S.Ct. 212, 215, 78 L.Ed. 369. Emphasis supplied.

22. Id., 290 U.S. at pages 382–383, 54 S. Ct. at pages 215, 216, quoting Hurtado v. California, 1884, 110 U.S. 516, 530–531, 4 S.Ct. 111, 292, 28 L.Ed. 232.

23. Selected Writings of Benjamin Nathan Cardozo 170 (Hall Ed. 1947).

24. Wheeler, J., concurring in Dwy v. Connecticut Co., 1915, 89 Conn. 74, 99, 92 A. 883, 891, L.R.A.1915E, 800.

25. Selected Writings of Benjamin Nathan Cardozo 172 (Hall Ed. 1947).