428 F.2d 1071
 138 U.S.App.D.C. 369
 Ethel JAVINS, Appellant,
v.
FIRST NATIONAL REALTY CORPORATION, Appellee.
Rudolph SAUNDERS, Appellant,
v.
FIRST NATIONAL REALTY CORPORATION, Appellee.
Stanley GROSS, Appellant,
v.
FIRST NATIONAL REALTY CORPORATION, Appellee.
 Nos. 22405, 22406, 22409.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Jan. 16, 1970.
Decided May 7, 1970.
 
 Mr. Edmund E. Fleming, Boston, Mass., for appellants.
 Mr. Herman Miller, Washington, D.C., for appellee.
 Mrs. Caryl S. Terry, Washington, D.C., filed a brief on behalf of Washington Planning and Housing Association as amicus curiae urging reversal.
 Mrs. Margaret F. Ewing, Mrs. Florence Wagman Roisman and Mrs. Patricia M. Wald, Washington, D.C., filed a brief on behalf of Neighborhood Legal Services Program as amicus curiae urging reversal.
 Messrs. Myron Moskovitz and Peter Honigsberg filed a brief on behalf of National Housing Law Project as amicus curiae urging reversal.
 Before WRIGHT, McGOWAN and ROBB, Circuit Judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 These cases present the question whether housing code[1] violations which arise during the term of a lease have any effect upon the tenant's obligation to pay rent. The Landlord and Tenant Branch of the District of Columbia Court of General Sessions ruled proof of such violations inadmissible when proffered as a defense to an eviction action for nonpayment of rent. The District of Columbia Court of Appeals upheld this ruling. Saunders v. First National Realty Corp., 245 A.2d 836 (1968).
 
 
 2
 Because of the importance of the question presented, we granted appeallants' petitions for leave to appeal. We now reverse and hold that a warranty of habitability, measured by the standards set out in the Housing Regulations for the District of Columbia, is implied by operation of law into leases of urban dwelling units covered by those Regulations and that breach of this warranty gives rise to the usual remedies for breach of contract.
 
 
 3
 * The facts revealed by the record are simple. By separate written leases,[2] each of the appellants rented an apartment in a three-building apartment complex in Northwest Washington known as Clifton Terrace. The landlord, First National Realty Corporation, filed separate actions in the Landlord and Tenant Branch of the Court of General Sessions on April 8, 1966, seeking possession on the ground that each of the appellants had defaulted in the payment of rent due for the month of April. The tenants, appellants here, admitted that they had not paid the landlord any rent for April. However, they alleged numerous violations of the Housing Regulations as 'an equitable defense or (a) claim by way of recoupment or set-off in an amount equal to the rent claim,' as provided in the rules of the Court of General Sessions.[3] They offered to prove
 
 
 4
 'that there are approximately 1500 violations of the Housing Regulations of the District of Columbia in the building at Clifton Terrace, where Defendant resides some affecting the premises of this Defendant directly, others indirectly, and all tending to establish a course of conduct of violation of the Housing Regulations to the damage of Defendants * * *.'
 
 
 5
 Settled Statement of Proceedings and Evidence, p. 2 (1966). Appellants conceded at trial, however, that this offer of proof reached only violations which had arisen since the term of the lease had commenced. The Court of General Sessions refused appellants' offer of proof[4] and entered judgment for the landlord. The District of Columbia Court of Appeals affirmed, rejecting the argument made by appellants that the landlord was under a contractual duty to maintain the premises in compliance with the Housing Regulations. Saunders v. First National Realty Corp., supra, 245 A.2d at 838.[5]
 
 II
 
 6
 Since, in traditional analysis, a lease was the conveyance of an interest in land, courts have usually utilized the special rules governing real property transactions to resolve controversies involving leases. However, as the Supreme Court has noted in another context, 'the body of private property law * * *, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical.'[6] Courts have a duty to reappraise old doctrines in the light of the facts and values of contemporary life-- particularly old common law doctrines which the courts themselves created and developed.[7] As we have said before, 'The continued vitality of the common law * * * depends upon its ability to reflect contemporary community values and ethics.'[8]
 
 
 7
 The assumption of landlord-tenant law, derived from feudal property law, that a lease primarily conveyed to the tenant an interest in land may have been reasonable in a rural, agrarian society; it may continue to be reasonable in some leases involving farming or commercial land. In these cases, the value of the lease to the tenant is the land itself. But in the case of the modern apartment dweller, the value of the lease is that it gives him a place to live. The city dweller who seeks to lease an apartment on the third floor of a tenement has little interest in the land 30 or 40 feet below, or even in the bare right to possession within the four walls of his apartment. When American city dwellers, both rich and poor, seek 'shelter' today, they seek a well known package of goods and services[9] -- a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance.
 
 
 8
 Professor Powell summarizes the present state of the law:
 
 
 9
 '* * * The complexities of city life, and the proliferated problems of modern society in general, have created new problems for lessors and lessees and these have been commonly handled by specific clauses inserted in leases. This growth in the number and detail of specific lease covenants has reintroduced into the law of estates for years a predominantly contractual ingredient. In practice, the law today concerning estates for years consists chiefly of rules determining the construction and effect of lease covenants. * * *'[10]
 
 
 10
 Ironically, however, the rules governing the construction and interpretation of 'predominantly contractual' obligations in leases have too often remained rooted in old property law.
 
 
 11
 Some courts have realized that certain of the old rules of property law governing leases are inappropriate for today's transactions. In order to reach results more in accord with the legitimate expectations of the parties and the standards of the community, courts have been gradually introducing more modern precepts of contract law in interpreting leases.[11] Proceeding piecemeal has, however, led to confusion where 'decisions are frequently conflicting, not because of a healthy disagreement on social policy, but because of the lingering impact of rules whose policies are long since dead.'[12]
 
 
 12
 In our judgment the trend toward treating leases as contracts is wise and well considered. Our holding in this case reflects a belief that leases of urban dwelling units should be interpreted and construed like any other contract.[13]
 
 III
 
 13
 Modern contract law has recognized that the buyer of goods and services in an industrialized society must rely upon the skill and honesty of the supplier to assure that goods and services purchased are of adequate quality.[14] In interpreting most contracts, courts have sought to protect the legitimate expectations of the buyer and have steadily widened the seller's responsibility for the quality of goods and services through implied warranties of fitness and merchantability.[15] Thus without any special agreement a merchant will be held to warrant that his goods are fit for the ordinary purposes for which such goods are used and that they are at least of reasonably average quality. Moreover, if the supplier has been notified that goods are required for a specific purpose, he will be held to warrant that any goods sold are fit for that purpose. These implied warranties have become widely accepted and well established features of the common law, supported by the overwhelming body of case law.[16] Today most states as well as the District of Columbia[17] have codified and enacted these warranties into statute, as to the sale of goods, in the Uniform Commercial Code.
 
 
 14
 Implied warranties of quality have not been limited to cases involving sales. The consumer renting a chattel, paying for services, or buying a combination of goods and services must rely upon the skill and honesty of the supplier to at least the same extent as a purchaser of goods. Courts have not hesitated to find implied warranties of fitness and merchantability in such situations.[18] In most areas product liability law has moved far beyond 'mere' implied warranties running between two parties in privity with each other.[19]
 
 
 15
 The rigid doctrines of real property law have tended to inhibit the application of implied warranties to transactions involving real estate.[20] Now, however, courts have begun to hold sellers and developers of real property responsible for the quality of their product.[21] For example, builders of new homes have recently been held liable to purchasers for improper construction on the ground that the builders had breached an implied warranty of fitness.[22] In other cases courts have held builders of new homes liable for breach of an implied warranty that all local building regulations had been complied with.[23] And following the developments in other areas, very recent decisions[24] and commentary[25] suggest the possible extension of liability to parties other than the immediate seller for improper construction of residential real estate.
 
 
 16
 Despite this trend in the sale of real estate, many courts have been unwilling to imply warranties of quality, specifically a warranty of habitability, into leases of apartments. Recent decisions have offered no convincing explanation for their refusal;[26] rather they have relied without discussion upon the old common law rule that the lessor is not obligated to repair unless he covenants to do so in the written lease contract.[27] However, the Supreme Courts of at least two states, in recent and well reasoned opinions, have held landlords to implied warranties of quality in housing leases. Lemle v. Breeden, S.Ct.Hawaii, 462 P.2d 470 (1969); Reste Realty Corp. v. Cooper, 53 N.J. 444, 251 A.2d 268 (1969). See also Pines v. Perssion, 14 Wis.2d 590, 111 N.W.2d 409 (1961). In our judgment, the old no-repair rule cannot coexist with the obligations imposed on the landlord by a typical modern housing code, and must be abandoned[28] in favor of an implied warranty of habitability.[29] In the District of Columbia, the standards of this warranty are set out in the Housing Regulations.
 
 IV
 
 17
 A. In our judgment the common law itself must recognize the landlord's obligation to keep his premises in a habitable condition. This conclusion is compelled by three separate considerations. First, we believe that the old rule was based on certain factual assumptions which are no longer true; on its own terms, it can no longer be justified. Second, we believe that the consumer protection cases discussed above require that the old rule be abandoned in order to bring residential landlord-tenant law into harmony with the principles on which those cases rest. Third, we think that the nature of today's urban housing market also dictates abandonment of the old rule.
 
 
 18
 The common law rule absolving the lessor of all obligation to repair originated in the early Middle Ages.[30] Such a rule was perhaps well suited to an agrarian economy; the land was more important[31] than whatever small living structure was included in the leasehold, and the tenant farmer was fully capable of making repairs himself.[32] These historical facts were the basis on which the common law constructed its rule; they also provided the necessary prerequisites for its application.[33]
 
 
 19
 Court decisions in the late 1800's began to recognize that the factual assumptions of the common law were no longer accurate in some cases. For example, the common law, since it assumed that the land was the most important part of the leasehold, required a tenant to pay rent even if any building on the land was destroyed.[34] Faced with such a rule and the ludicrous results it produced, in 1863 the New York Court of Appeals declined to hold that an upper story tenant was obliged to continue paying rent after his apartment building burned down.[35] The court simply pointed out that the urban tenant had no interest in the land, only in the attached building.
 
 
 20
 Another line of cases created an exception to the no-repair rule for short term leases of furnished dwellings.[36] The Massachusetts Supreme Judicial Court, a court not known for its willingness to depart from the common law, supported this exception, pointing out:
 
 
 21
 '* * * (A) different rule should apply to one who hires a furnished room, or a furnished house, for a few days, or a few weeks or months. Its fitness for immediate use of a particular kind, as indicated by its appointments, is a far more important element entering into the contract than when there is a mere lease of real estate. One who lets for a short term a house provided with all furnishings and appointments for immediate residence may be supposed to contract in reference to a well-understood purpose of the hirer to use it as a habitation. * * * It would be unreasonable to hold, under such circumstances, that the landlord does not impliedly agree that what he is letting is a house suitable for occupation in its condition at the time. * * *'[37]
 
 
 22
 These as well as other similar cases[38] demonstrate that some courts began some time ago to question the common law's assumptions that the land was the most important feature of a leasehold and that the tenant could feasibly make any necessary repairs himself. Where those assumptions no longer reflect contemporary housing patterns, the courts have created exceptions to the general rule that landlords have no duty to keep their premises in repair.
 
 
 23
 It is overdue for courts to admit that these assumptions are no longer true with regard to all urban housing. Today's urban[39] tenants, the vast majority of whom live in multiple dwelling houses, are interested, not in the land, but solely in 'a house suitable for occupation.' Furthermore, today's city dweller usually has a single, specialized skill unrelated to maintenance work; he is unable to make repairs like the 'jack-of-all-trades' farmer who was the common law's model of the lessee.[40] Further, unlike his agrarian predecessor who often remained on one piece of land for his entire life, urban tenants today are more mobile than ever before. A tenant's tenure in a specific apartment will often not be sufficient to justify efforts at repairs. In addition, the increasing complexity of today's dwellings renders them much more difficult to repair than the structures of earlier times. In a multiple dwelling repair may require access to equipment and areas in the control of the landlord. Low and middle income tenants, even if they were interested in making repairs, would be unable to obtain any financing for major repairs since they have no long-term interest in the property.
 
 
 24
 Our approach to the common law of landlord and tenant ought to be aided by principles derived from the consumer protection cases referred to above.[41] In a lease contract, a tenant seeks to purchase from his landlord shelter for a specified period of time. The landlord sells housing as a commercial businessman and has much greater opportunity, incentive and capacity to inspect and maintain the condition of his building. Moreover, the tenant must rely upon the skill and bona fides of his landlord at least as much as a car buyer must rely upon the car manufacturer. In dealing with major problems, such as heating, plumbing, electrical or structural defects, the tenant's position corresponds precisely with 'the ordinary consumer who cannot be expected to have the knowledge or capacity or even the opportunity to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose.' Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 375, 161 A.2d 69, 78 (1960).[42]
 
 
 25
 Since a lease contract specifies a particular period of time during which the tenant has a right to use his apartment for shelter, he may legitimately expect that the apartment will be fit for habitation for the time period for which it is rented. We point out that in the present cases there is no allegation that appellants' apartments were in poor condition or in violation of the housing code at the commencement of the leases.[43] Since the lessees continue to pay the same rent, they were entitled to expect that the landlord would continue to keep the premises in their beginning condition during the lease term. It is precisely such expectations that the law now recognizes as deserving of formal, legal protection.
 
 
 26
 Even beyond the rationale of traditional products liability law, the relationship of landlord and tenant suggests further compelling reasons for the law's protection of the tenants' legitimate expectations of quality. The inequality in bargaining power between landlord and tenant has been well documented.[44] Tenants have very little leverage to enforce demands for better housing. Various impediments to competition in the rental housing market, such as racial and class discrimination[45] and standardized form leases,[46] mean that landlords place tenants in a take it or leave it situation. The increasingly severe shortage[47] of adequate housing further increases the landlord's bargaining power and escalates the need for maintaining and improving the existing stock. Finally, the findings by various studies of the social impact of bad housing has led to the realization that poor housing is detrimental to the whole society, not merely to the unlucky ones who must suffer the daily indignity of living in a slum.[48]
 
 
 27
 Thus we are led by our inspection of the relevant legal principles and precedents to the conclusion that the old common law rule imposing an obligation upon the lessee to repair during the lease term was really never intended to apply to residential urban leaseholds. Contract principles established in other areas of the law provide a more rational framework for the apportionment of landlord-tenant responsibilities; they strongly suggest that a warranty of habitability be implied into all contracts[49] for urban dwellings.
 
 
 28
 B. We believe, in any event, that the District's housing code requires that a warranty of habitability be implied in the leases of all housing that it covers. The housing code-- formally designated the Housing Regulations of the District of Columbia-- was established and authorized by the Commissioners of the District of Columbia on August 11, 1955.[50] Since that time, the code has been updated by numerous orders of the Commissioners. The 75 pages of the Regulations provide a comprehensive regulatory scheme setting forth in some detail: (a) the standards which housing in the District of Columbia must meet;[51] (b) which party, the lessor or the lessee, must meet each standard; and (c) a system of inspections, notifications and criminal penalties. The Regulations themselves are silent on the question of private remedies.
 
 
 29
 Two previous decisions of this court, however, have held that the Housing Regulations create legal rights and duties enforceable in tort by private parties. In Whetzel v. Jess Fisher Management Co., 108 U.S.App.D.C. 385, 282 F.2d 943 (1960), we followed the leading case of Altz v. Lieberson, 233 N.Y. 16, 134 N.E. 703 (1922), in holding (1) that the housing code altered the common law rule and imposed a duty to repair upon the landlord, and (2) that a right of action accrued to a tenant injured by the landlord's breach of this duty. As Judge Cardozo wrote in Lieberson:
 
 
 30
 '* * * We may be sure that the framers of this statute, when regulating tenement life, had uppermost in thought the care of those who are unable to care for themselves. The Legislature must have known that unless repairs in the rooms of the poor were made by the landlord, they would not be made by any one. The duty imposed became commensurate with the need. The right to seek redress is not limited to the city or its officers. The right extends to all whom there was a purpose to protect. * * *'
 
 
 31
 134 N.E. at 704. Recently, in Kanelos v. Kettler, 132 U.S.App.D.C. 133, 135, 406 F.2d 951, 953 (1968), we reaffirmed our position in Whetzel, holding that 'the Housing Regulations did impose maintenance obligations upon appellee (landlord) which he was not free to ignore.'[52]
 
 
 32
 The District of Columbia Court of Appeals gave further effect to the Housing Regulations in Brown v. Southall Realty Co., 237 A.2d 834 (1968). There the landlord knew at the time the lease was signed that housing code violations existed which rendered the apartment 'unsafe and unsanitary.' Viewing the lease as a contract, the District of Columbia Court of Appeals held that the premises were let in violation of Sections 2304[53] and 2501[54] of the Regulations and that the lease, therefore, was void as an illegal contract. In the light of Brown, it is clear not only that the housing code creates privately enforceable duties as held in Whetzel, but that the basic validity of every housing contract depends upon substantial compliance with the housing code at the beginning of the lease term. The Brown court relied particularly upon Section 2501 of the Regulations which provides:
 
 
 33
 'Every premises accommodating one or more habitations shall be maintained and kept in repair so as to provide decent living accommodations for the occupants. This part of this Code contemplates more than mere basic repairs and maintenance to keep out the elements; its purpose is to include repairs and maintenance designed to make a premises or neighborhood healthy and safe.'
 
 
 34
 By its terms, this section applies to maintenance and repair during the lease term. Under the Brown holding, serious failure to comply with this section before the lease term begins renders the contract void. We think it untenable to find that this section has no effect on the contract after it has been signed. To the contrary, by signing the lease the landlord has undertaken a continuing obligation to the tenant to maintain the premises in accordance with all applicable law.
 
 
 35
 This principle of implied warranty is well established. Courts often imply relevant law into contracts to provide a remedy for any damage caused by one party's illegal conduct.[55] In a case closely analogous to the present ones, the Illinois Supreme Court held that a builder who constructed a house in violation of the Chicago building code had breached his contract with the buyer:
 
 
 36
 '* * * The law existing at the time and place of the making of the contract is deemed a part of the contract, as though expressly referred to or incorporated in it. * * *
 
 
 37
 'The rationale for this rule is that the parties to the contract would have expressed that which the law implies 'had they not supposed that it was unnecessary to speak of it because the law provided for it.' * * * Consequently, the courts, in construing the existing law as part of the express contract, are not reading into the contract provisions different from those expressed and intended by the parties, as defendants contend, but are merely construing the contract in accordance with the intent of the parties.'[56]
 
 
 38
 We follow the Illinois court in holding that the housing code must be read into housing contracts-- a holding also required by the purposes and the structure of the code itself.[57] The duties imposed by the Housing Regulations may not be waived or shifted by agreement if the Regulations specifically place the duty upon the lessor.[58] Criminal penalties are provided if these duties are ignored. This regulatory structure was established by the Commissioners because, in their judgment, the grave conditions in the housing market required serious action. Yet official enforcement of the housing code has been far from uniformly effective.[59] Innumerable studies have documented the desperate condition of rental housing in the District of Columbia and in the nation. In view of these circumstances, we think the conclusion reached by the Supreme Court of Wisconsin as to the effect of a housing code on the old common law rule cannot be avoided:
 
 
 39
 '* * * The legislature has made a policy judgment-- that it is socially (and politically) desirable to impose these duties on a property owner-- which has rendered the old common law rule obsolete. To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards. * * *'[60]
 
 
 40
 We therefore hold that the Housing Regulations imply a warranty of habitability, measured by the standards which they set out, into leases of all housing that they cover.
 
 V
 
 41
 In the present cases, the landlord sued for possession for nonpayment of rent. Under contract principles,[61] however, the tenant's obligation to pay rent is dependent upon the landlord's performance of his obligations, including his warranty to maintain the premises in habitable condition. In order to determine whether any rent is owed to the landlord, the tenants must be given an opportunity to prove the housing code violations alleged as breach of the landlord's warranty.[62]
 
 
 42
 At trial, the finder of fact must make two findings: (1) whether the alleged violations[63] existed during the period for which past due rent is claimed, and (2) what portion, if any or all, of the tenant's obligation to pay rent was suspended by the landlord's breach. If no part of the tenant's rental obligation is found to have been suspended, then a judgment for possession may issue forthwith. On the other hand, if the jury determines that the entire rental obligation has been extinguished by the landlord's total breach, then the action for possession on the ground of nonpayment must fail.[64]
 
 
 43
 The jury may find that part of the tenant's rental obligation has been suspended but that part of the unpaid back rent is indeed owed to the landlord.[65] In these circumstances, no judgment for possession should issue if the tenant agrees to pay the partial rent found to be due.[66] If the tenant refuses to pay the partial amount, a judgment for possession may then be entered.
 
 
 44
 The judgment of the District of Columbia Court of Appeals is reversed and the cases are remanded for further proceedings consistent with this opinion.[67]
 
 
 45
 So ordered.
 
 
 46
 Circuit Judge ROBB concurs in the result and in Parts IV-B and V of the opinion.
 
 
 
 [1]
 Housing Regulations of the District of Columbia (1956)
 
 
 [2]
 A clause in the lease provided that the tenant waived the statutory 30-day notice to quit. 45 D.C.Code 908 (1967) expressly permits waiver of this notice. Appellants' answer put in issue the validity of the waivers. In view of our disposition, we have no occasion to pass upon this aspect of the case
 
 
 [3]
 Rule 4(c) of the Landlord and Tenant Branch of the Court of General Sessions provides:
 'In suits in this branch for recovery of possession of property in which the basis of recovery of possession is nonpayment of rent, tenants may set up an equitable defense or claim by way of recoupment or set-off in an amount equal to the rent claim. No counterclaim may be filed unless plaintiff asks for money judgment for rent. The exclusion of prosecution of any claims in this branch shall be without prejudice to the prosecution of any claims in other branches of the court.'
 Appellants have sought only to defeat the landlord's action; they have not as yet claimed any money damages for the landlord's alleged breach of contract. Under Rule 4(c) supra, they may not counterclaim for money damages if the landlord seeks only possession and no money judgment, as it has done here. For the considerations to be applied in determining whether this rule conforms 'as nearly as may be practicable' to the Federal Rules of Civil Procedure as required by 13 D.C.Code 101 (1967), see McKelton v Bruno, 138 U.S.App.D.C. , 428 F.2d 718 (decided February 17, 1970).
 
 
 [4]
 According to established procedure, this case was submitted to both the District of Columbia Court of Appeals and this court on the basis of a sparse 'Settled Statement of Proceedings and Evidence,' as approved by both parties and the trial judge. Unfortunately, the court's ruling on the offer of proof was made from the bench, and the basis of the ruling is not reflected in the 'Settled Statement.' We have recently noted the inadequacy of such records for review by an appellate court. Lee v. Habib, 137 U.S.App.D.C. 403, 424 F.2d 891 (1970)
 
 
 [5]
 In the District of Columbia Court of Appeals, appellee urged that these cases were moot on the basis of events occurring since the landlord initiated this litigation. The D.C. Court of Appeals held that the cases were not moot. Saunders v. First National Realty Co., 245 A.2d 836, 837 (1968). Appellee has not argued mootness here, and in any event we follow the ruling of the D.C. Court of Appeals on this point
 
 
 [6]
 Jones v. United States, 362 U.S. 257, 266, 80 S.Ct. 725, 733, 4 L.Ed.2d 697 (1960)
 
 
 [7]
 See Spencer v. General Hospital of the District of Columbia, 138 U.S.App.D.C. 48, 53, 425 F.2d 479, 484 (1969) (en banc); Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 90, 207 A.2d 314, 325 (1965). Cf. 11 S. Williston, Contracts 1393A at 461 (3d ed. W. Jaeger 1968) ('Most of the leading jurisdictions have not hesitated to undo a judicially committed blunder * * * by employing the same means-- judicial decisions') and cases cited therein at n. 20
 
 
 [8]
 Whetzel v. Jess Fisher Management Co., 108 U.S.App.D.C. 385, 388, 282 F.2d 943, 946 (1960)
 
 
 [9]
 See, e.g., National Commission on Urban Problems, Building the American City 9 (1968). The extensive standards set out in the Housing Regulations provide a good guide to community expectations
 
 
 [10]
 2 R. Powell, Real Property P221(1) at 179 (1967)
 
 
 [11]
 E.g., Medico-Dental Building Co. v. Horton & Converse, 21 Cal.2d 411, 418, 132 P.2d 457, 462 (1942). See also 1 American Law of Property 3.11 at 202-205 (A. Casner ed. 1952); Note, The California Lease-- Contract or Conveyance?, 4 Stan.L.Rev. 244 (1952); Friedman, The Nature of a Lease in New York, 33 Cornell L.Q. 165 (1947)
 
 
 [12]
 Kessler, The Protection of the Consumer Under Modern Sales Law, 74 Yale L.J. 262, 263 (1964)
 
 
 [13]
 This approach does not deny the possible importance of the fact that land is involved in a transaction. The interpretation and construction of contracts between private parties has always required courts to be sensitive and responsive to myriad different factors. We believe contract doctrines allow courts to be properly sensitive to all relevant factors in interpreting lease obligations
 We also intend no alteration of statutory or case law definitions of the term 'real property' for purposes of statutes or decisions on recordation, descent, conveyancing, creditors' rights, etc. We contemplate only that contract law is to determine the rights and obligations of the parties to the lease agreement, as between themselves. The civil law has always viewed the lease as a contract, and in our judgment that perspective has proved superior to that of the common law. See 2 M. Planiol, Treatise on the Civil Law 1663 et seq. (1959); 11 La.Stat.Ann., Civil Code, Art. 2669 (1952).
 
 
 [14]
 See generally 8 S. Williston, Contracts 983-989 (3d ed. W. Jaeger 1964); W. Prosser, Torts 95 (3d ed. 1964)
 
 
 [15]
 See Jaeger, Warranties of Merchantability and Fitness for Use, 16 Rutgers L.Rev. 493 (1962); Uniform Commercial Code 2-314, 2-315 (1968)
 
 
 [16]
 Ibid
 
 
 [17]
 28 D.C.Code Subtitle I (1967)
 
 
 [18]
 Farnsworth, Implied Warranties of Quality in Non-Sales Cases, 57 Colum.L.Rev. 653 (1957). See Cintrone v. Hertz Truck Leasing & Rental Service, 45 N.J. 434, 212 A.2d 769 (1965); 2 F. Harper & F. James, Torts 28.19 at 1577 n. 5 and n. 6 (1956)
 
 
 [19]
 See, e.g., Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960); Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963). See generally Prosser, The Assault Upon the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960); Jaeger, Product Liability: The Constructive Warranty, 39 Notre Dame Lawyer 501 (1964)
 
 
 [20]
 See Fegeas v. Sherill, 218 Md. 472, 147 A.2d 223 (1958); 7 S. Williston, Contracts 926 at 800-801, 926A (3d ed. W. Jaeger 1963)
 
 
 [21]
 See generally Bearman, Caveat Emptor in Sale of Realty-- Recent Assaults Upon the Rule, 14 Vand.L.Rev. 541 (1961); Dunham, Vendor's Obligation as to Fitness of Land for a Particular Purpose, 37 Minn.L.Rev. 108 (1953)
 
 
 [22]
 See Waggoner v. Midwestern Development, Inc., S.D., 154 N.W.2d 803 (1967); Bethlahmy v. Bechtel, 91 Idaho 55, 415 P.2d 698 (1969); Schipper v. Levitt & Sons, Inc., supra Note 7; Carpenter v. Donohoe, 154 Colo. 78, 388 P.2d 399 (1964); Loraso v. Custom Built Homes, Inc., La.App., 144 So.2d 459 (1962). Other cases still continue the older limitation on the vendor's liability to homes sold before construction is complete. See, e.g., Hoye v. Century Builders, 52 Wash.2d 830, 329 P.2d 474 (1958)
 
 
 [23]
 See Schiro v. W. E. Gould & Co., 18 Ill.2d 538, 165 N.E.2d 286 (1960); Annot., 110 A.L.R. 1048 (1937)
 
 
 [24]
 Connor v. Great Western Savings and Loan Ass'n, 69 Cal.2d 850, 73 Cal.Rptr. 369, 447 P.2d 609 (1968) (in bank) (Traynor, Ch. J.). Chief Justice Traynor's excellent opinion utilizes tort doctrines to extend liability beyond the immediate seller
 
 
 [25]
 Comment, Liability of the Institutional Lender for Structural Defects in New Housing, 35 U.Chi.L.Rev. 739 (1968)
 
 
 [26]
 E.g., Kearse v. Spaulding, 406 Pa. 140, 176 A.2d 450 (1962); Susskind v. 1136 Tenants Corp., 43 Misc.2d 588, 251 N.Y.S.2d 321 (1964); Rubinger v. Del Monte, N.Y.S.Ct., App.T., 217 N.Y.S.2d 792 (1961)
 
 
 [27]
 The cases which recite this old rule are legion. A representative sampling is cited in 32 Am.Jur. Landlord and Tenant 655 n. 14 (1941)
 
 
 [28]
 As far as tort liability is concerned, we have previously held that the old common law rule has been changed by passage of the housing code and that the landlord has a duty to maintain reasonably safe premises. See Note 52 infra
 
 
 [29]
 Although the present cases involve written leases, we think there is no particular significance in this fact. The landlord's warranty is implied in oral and written leases for all types of tenancies
 
 
 [30]
 The rule was 'settled' by 1485. 3 W. Holdsworth, A History of English Law 122-123 (6th ed. 1934). The common law rule discussed in text originated in the even older rule prohibiting the tenant from committing waste. The writ of waste expanded as the tenant's right to possession grew stronger. Eventually, in order to protect the landowner's reversionary interest, the tenant became obligated to make repairs and liable to eviction and damages if he failed to do so. Ibid
 
 
 [31]
 The land was so central to the original common law conception of a leasehold that rent was viewed as 'issuing' from the land: 'The governing idea is that the land is bound to pay the rent * * *. We may almost go to the length of saying that the land pays it through (the tenant's) hand.' 2 F. Pollock & F. Maitland, The History of English Law 131 (2d ed. 1923)
 
 
 [32]
 Many later judicial opinions have added another justification of the old common law rule. They have invoked the timeworn cry of caveat emptor and argued that a lessee has the opportunity to inspect the premises. On the basis of his inspection, the tenant must then take the premises 'as is,' according to this reasoning. As an historical matter, the opportunity to inspect was not thought important when the rule was first devised. See Note 30 supra. To the extent the no-repair rule rests on caveat emptor, see page 1079, infra
 
 
 [33]
 Even the old common law courts responded with a different rule for a landlord-tenant relationship which did not conform to the model of the usual agrarian lease. Much more substantial obligations were placed upon the keepers of inns (the only multiple dwelling houses known to the common law). Their guests were interested solely in shelter and could not be expected to make their own repairs. 'The modern apartment dweller more closely resembles the guest in an inn than he resembles an agrarian tenant, but the law has not generally recognized the similarity.' J. Levi, P. Hablutzel, L. Rosenberg & J. White, Model Residential Landlord-Tenant Code 6-7 (Tent. Draft 1969)
 
 
 [34]
 Paradine v. Jane, Aleyn 26, 82 Eng.Rep. 897 (K.B. 1947); 1 American Law of Property, supra Note 11, 3.103
 
 
 [35]
 Graves v. Berdan, 26 N.Y. 498 (1863)
 
 
 [36]
 1 American Law of Property, supra Note 11, 3.45 at 267-268, and cases cited therein
 
 
 [37]
 Ingalls v. Hobbs, 156 Mass. 348, 31 N.E. 286 (1892)
 
 
 [38]
 The cases developing the doctrines of 'quiet enjoyment' and 'constructive eviction' are the most important. See 2 R. Powell, supra Note 10, P225(3). See also Gladden v. Walker & Dunlop, 83 U.S.App.D.C. 224, 168 F.2d 321 (1948) (landlord has duty to maintain portions of apartment 'under his control' including plumbing, heating and electrical systems); J. D. Young Corp. v. McClintic, Tex.Civ.App., 26 S.W.2d 460 (1930) (implied covenant of fitness in lease of building under construction); Steefel x. Rothschild, 179 N.Y. 273, 72 N.E. 112 (1904) (duty to disclose latent defects)
 
 
 [39]
 In 1968 more than two thirds of America's people lived in the 228 largest metropolitan areas. Only 5.2% Lived on farms. The World Almanac 1970 at 251 (L. Long ed.). More than 98% Of all housing starts in 1968 were non-farm. Id. at 313
 
 
 [40]
 See J. Levi et al., supra Note 33, at 6
 
 
 [41]
 See Part III, supra
 
 
 [42]
 Nor should the average tenant be thought capable of 'inspecting' plaster, floorboards, roofing, kitchen appliances, etc. To the extent, however, that some defects are obvious, the law must take note of the present housing shortage. Tenants may have no real alternative but to accept such housing with the expectation that the landlord will make necessary repairs. Where this is so, caveat emptor must of necessity be rejected
 
 
 [43]
 In Brown v. Southall Realty Co., 237 A.2d 834 (1968), the District of Columbia Court of Appeals held that unsafe and unsanitary conditions existing at the beginning of the tenancy and known to the landlord rendered any lease of those premises illegal and void
 
 
 [44]
 See Edwards v. Habib, 130 U.S.App.D.C. 126, 140, 397 F.2d 687, 701 (1968); 2 R. Powell, supra Note 10, P221(1) at 183; President's Committee on Urban Housing, A Decent Home 96 (1968)
 
 
 [45]
 President's Committee, supra Note 44, at 96; National Commission, supra Note 9, at 18-19; G. Sternlieb, The Tenement Landlord 71 (1966)
 
 
 [46]
 R.Powell, supra Note 10, P221(1) at 183 n. 13
 
 
 [47]
 See generally President's Committee, supra Note 44
 
 
 [48]
 A. Schorr, Slums and Insecurity (1963); J. Levi, et al., supra Note 33, at 7-8
 
 
 [49]
 We need not consider the provisions of the written lease governing repairs since this implied warranty of the landlord could not be excluded. See Henningsen v. Bloomfield Motors, Inc., supra Note 19; Kay v. Cain, 81 U.S.App.D.C. 24, 25, 154 F.2d 305, 306 (1946). See also Note 58, infra
 
 
 [50]
 2 D.C.Register 47 (1955)
 
 
 [51]
 These include standards for nursing homes and other similar institutions. The full scheme of the Regulations is set out in Whetzel v. Fisher Management Co., supra Note 8
 
 
 [52]
 Kanelos and Whetzel have effectively overruled, on the basis of the enactment of the housing code, Bewles v. Mahoney, 91 U.S.App.D.C. 155, 202 F.2d 320 (1952) (two to one decision, Judge Bazelon dissenting)
 
 
 [53]
 'No person shall rent or offer to rent any habitation, or the furnishings thereof, unless such habitation and its furnishings are in a clean, safe and sanitary condition, in repair, and free from rodents or vermin.'
 
 
 [54]
 See infra
 
 
 [55]
 See cases cited in Annot., 110 A.L.R. 1048 (1937)
 
 
 [56]
 Schiro v. W. E. Gould & Co., supra Note 23, 18 Ill.2d at 544, 165 N.E.2d at 290. As a general proposition, it is undoubtedly true that parties to a contract intend that applicable law will be complied with by both sides. We recognize, however, that reading statutory provisions into private contracts may have little factual support in the intentions of the particular parties now before us. But, for reasons of public policy, warranties are often implied into contracts by operation of law in order to meet generally prevailing standards of honesty and fair dealing. When the public policy has been enacted into law like the housing code, that policy will usually have deep roots in the expectations and intentions of most people. See Costigan, Implied-in-Fact Contracts and Mutual Assent, 33 Harv.L.Rev. 376, 383-385 (1920)
 
 
 [57]
 'The housing and sanitary codes, especially in light of Congress' explicit direction for their enactment, indicate a strong and pervasive congressional concern to secure for the city's slum dwellers decent, or at least safe and sanitary, places to live.' Edwards v. Habib, supra Note 44, 130 U.S.App.D.C. at 139, 397 F.2d at 700
 
 
 [58]
 Any private agreement to shift the duties would be illegal and unenforceable. The precedents dealing with industrial safety statutes are directly in point:
 '* * * The only question remaining is whether the courts will enforce or recognize as against a servant an agreement express or implied on his part to waive the performance of a statutory duty of the master imposed for the protection of the servant, and in the interest of the public, and enforceable by criminal prosecution. We do not think they will. To do so would be to nullify the object of the statute. * * *'
 Narramore v. Cleveland, C., C. & St. L.Ry. Co., 6 Cir., 96 F. 298, 302 (1899). See W. Prosser, Torts 67 at 468-469 (3d ed. 1964) and cases cited therein.
 
 
 [59]
 See Gribetz & Grad, Housing Code Fnforcement: Sanctions and Remedies, 66 Colum.L.Rev. 1254 (1966); Note, Enforcement of Municipal Housing Codes, 78 Harv.L.Rev. 801 (1965)
 
 
 [60]
 Pines v. Perssion, 14 Wis.2d 590, 596, 111 N.W.2d 409, 412-413 (1961). Accord, Buckner v. Azulai, 251 Cal.App.2d Supp. 1013, 59 Cal.Rptr. 806 (1967)
 
 
 [61]
 In extending all contract remedies for breach to the parties to a lease, we include an action for specific performance of the landlord's implied warranty of habitability
 
 
 [62]
 To be relevant, of course, the violations must affect the tenant's apartment or common areas which the tenant uses. Moreover, the contract principle that no one may benefit from his own wrong will allow the landlord to defend by proving the damage was caused by the tenant's wrongful action. However, violations resulting from inadequate repairs or materials which disintegrate under normal use would not be assignable to the tenant. Also we agree with the District of Columbia Court of Appeals that the tenant's private rights do not depend on official inspection or official finding of violation by the city government. Diamond Housing Corp. v. Robinson, 257 A.2d 492, 494 (1969)
 
 
 [63]
 The jury should be instructed that one or two minor violations standing alone which do not affect habitability are de minimis and would not entitle the tenant to a reduction in rent
 
 
 [64]
 As soon as the landlord made the necessary repairs rent would again become due. Our holding, of course, affects only eviction for nonpayment of rent. The landlord is free to seek eviction at the termination of the lease or on any other legal ground
 
 
 [65]
 In George Y. Worthington & Son Management Corp. v. Levy, 204 A.2d 334, 336 (1964), the District of Columbia Court of Appeals approved a similar procedure:
 'In actions for possession of real property by reason of default in rent, where no money judgment for the back rent is sought, it is nevertheless proper practice for the trial court to specifically find the amount of rent in arrears. * * *'
 
 
 [66]
 Compare Molyneaux v. Town House, Inc., D.C.C.A., 195 A.2d 744 (1963). A jury finding that the landlord had failed to live up to all of his obligations would operate as a conclusive finding that the tenant was entitled to equitable relief under Molyneaux
 
 
 [67]
 Appellants in the present cases offered to pay rent into the registry of the court during the present action. We think this is an excellent protective procedure. If the tenant defends against an action for possession on the basis of breach of the landlord's warranty of habitability, the trial court may require the tenant to make future rent payments into the registry of the court as they become due; such a procedure would be appropriate only while the tenant remains in possession. The escrowed money will, however, represent rent for the period between the time the landlord files suit and the time the case comes to trial. In the normal course of litigation, the only factual question at trial would be the condition of the apartment during the time the landlord alleged rent was due and not paid
 As a general rule, the escrowed money should be apportioned between the landlord and the tenant after trial on the basis of the finding of rent actually due for the period at issue in the suit. To insure fair apportionment, however, we think either party should be permitted to amend its complaint or answer at any time before trial, to allege a change in the condition of the apartment. In this event, the finder of fact should make a separate finding as to the condition of the apartment at the time at which the amendment was filed. This new finding will have no effect upon the original action; it will only affect the distribution of the escrowed rent paid after the filing of the amendment.