**CITY OF PHILADELPHIA**

v.

**William PAGE and Gloria Page**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al.**

**Civ. A. No. 72–1706.**

United States District Court,
E. D. Pennsylvania.

Sept. 7, 1973.

Martin Weinberg, City Sol., John S. Neeson Jr., Asst. City Sol., Philadelphia, Pa., for plaintiff.

**150**

George D. Gould, Community Legal Services, Inc., James A. Young, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for defendants.

Gilbert J. Scutti, Asst. U. S. Atty., Robert E. J. Curran, U. S. Atty., Philadelphia, Pa., for additional defendants.

## MEMORANDUM and ORDER

JOHN MORGAN DAVIS, District Judge.

This action was originally commenced in the Philadelphia Court of Common Pleas by the City of Philadelphia against William and Gloria Page. The relief sought is an order enjoining Defendants from violating the Philadelphia Health Code by allowing the continued presence of dangerous lead-based paint on their property. Defendants have joined the Department of Housing and Urban Development (HUD) and various officials thereof on a theory of liability over. The entire action is now before this Court following removal from the state court.

The Pages purchased a home from HUD on May 27, 1969. HUD also insured the mortgage under Section 221(d)(2) of the National Housing Act. On November 9, 1970, the Philadelphia Department of Public Health determined that the level of lead-based paint on the interior surfaces of the Pages' home exceeded the maximum percentage permitted under the Philadelphia Code. Following the Pages' failure to correct this hazardous condition, the instant action was started.

Now before the Court are two motions: the Third Party Defendants' Motion to Dismiss or Alternatively for Summary Judgment, and the Third Party Plaintiffs' (Defendants') Cross-Motion for Summary Judgment against the Third Party Defendants.

Initially it must be noted that the Third Party Complaint by the Pages against HUD sounds in contract rather than in tort. The theory advanced by the Pages is that HUD breached an implied warranty of habitability by selling a house containing numerous areas of lead paint in dangerous amounts. Therefore, they claim, the City of Philadelphia should require HUD, rather than the Pages, to undergo the expense of correcting the lead paint hazard.

The Pages allege two bases for Federal Court jurisdiction over this cause of action: (1) derivative jurisdiction over HUD by removal from the state court action in which HUD was liable under the "sue and be sued" clause in 12 U.S.C. § 1702; (2) direct jurisdiction over the United States of America under the Tucker Act, 28 U.S.C. § 1346(a)(2).

We will discuss the jurisdictional issues first and then consider the substantive claim of breach of implied warranty of habitability.

The last sentence of 12 U.S.C. § 1702 is:

"The Secretary [of Housing and Urban Development] shall . . . be authorized in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal."

Title 28 U.S.C. § 1346(a)(2), otherwise known as the Tucker Act, provides that:

"(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

\*       \*       \*       \*       \*       \*

"(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded \* \* \* upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."

Concerning § 1702 above, the Supreme Court has said that a waiver of immunity must be strictly construed because immunity is disfavored. FHA Region No. 4 v. Burr, 309 U.S. 242, 60 S. Ct. 488, 84 L.Ed. 724 (1940). The courts have also decided that § 1702 is not limited by the Tucker Act and indeed, § 1702 authorizes suits for breach of contract in addition to any possible remedies under the Tucker Act. Merge

v. Sharott, 341 F.2d 989 (3rd Cir. 1965); George H. Evans & Co. v. United States, 169 F.2d 500 (3rd Cir. 1948); Seven Oaks v. FHA, 171 F.2d 947 (4th Cir. 1948); Ferguson v. Union National Bank of Clarksburg, W. Va., 126 F.2d 753 (4th Cir. 1942); Travelers Indemnity Co. v. First Nat. Bank of N. J., 328 F.Supp. 208, 212 (D. of N.J. 1971); James T. Barnes & Co. v. Romney, 334 F.Supp. 657 (E.D. of Mich. 1971).

Therefore, this Court has jurisdiction under 12 U.S.C. § 1702.

■ Concerning the Tucker Act, the Government points to the distinction between contracts implied in fact, which are true contracts, and contracts implied in law, which are only quasi-contracts. Since the Tucker Act by its terms applies only to contracts, it follows that only contracts implied in fact are within the Act. The courts have so held: See C. F. Harms Co. v. Erie R. R., 167 F.2d 562, 564 (2nd Cir. 1948), and cases cited in footnote 6 therein; Alliance Assurance Co. v. United States, 252 F.2d 529 (2nd Cir. 1958).

■ However, this distinction is inapposite to the present case. Here we do not have an implied contract at all, but an express contract in which an implied warranty may arise. It has been held that claims can be brought founded upon implied promises or warranties in express contracts or contracts implied in fact. *Alliance, supra*; Crouch v. United States, 31 F.2d 211, 212 (E.D. of S.C. 1928)

Therefore, the Court also has jurisdiction under the Tucker Act.

Now that we have determined that this Court has jurisdiction under both 12 U.S.C. § 1702 and the Tucker Act, we can consider the substantive claim of breach of implied warranty of habitability.

■ The Supreme Court has long held that the law will imply a warranty of fitness for the purpose intended when a buyer has reason to rely on, and does rely on, the judgment of the seller who produces the product, especially as to latent defects. Kellogg Bridge Co. v. Hamilton, 110 U.S. 108, 3 S.Ct. 537, 28 L.Ed. 86 (1884). The application of this principle in the field of housing has resulted in the declaration of an implied warranty of habitability to exist between a builder-vendor of a new home and the purchaser thereof. Elderkin v. Gaster, 447 Pa. 118, 288 A.2d 771 (1972); Schipper v. Levitt & Sons, 44 N.J. 70, 207 A.2d 314 (1965).

HUD raises two arguments against its liability under such a warranty; (1) Such a warranty did not arise in the present situation; (2) The lead paint hazard is not within the purview of such a warranty.

I.

In April, 1969, after HUD acquired properties, they were sold in accordance with procedures as outlined in the HUD Handbook, Property Disposition Handbook One to Four Families, FHA 4310.-5(1968).

■ HUD first argues that no implied warranty arose in the present case because the Pages bought the house on a "as is" basis, that is, "as is without warranty by the FHA as to physical condition." § 152 of the HUD Handbook. However, § 152 applies only to houses sold without a mortgage. In the present case, HUD insured the mortgage under § 221(d)(2) of the National Housing Act, 12 U.S.C. § 1715*l*(d)(2). Therefore, § 152 of the HUD Handbook does not apply to the present case.

Another reason that § 152 does not apply is that § 151 states:

> "*As-Is-Sales*. As-is sales are restricted to those properties which, when acquired, are structurally sound and otherwise in acceptable condition to qualify for insured mortgage financing, and repairs, renovation, or upgrading will not increase maximum sales appeal."

Thus it is obvious that "as-is" sales cannot apply to reconditioned houses, such as the Pages bought. For these two reasons, we reject HUD's argument

152

that the Pages bought the house on an "as-is" basis.

■ HUD next argues that all the cases cited by the Pages to support an implied warranty of habitability apply only to a builder-vendor, not to a reconditioner-vendor. This Court sees no difference between the circumstances regarding totally new housing and reconditioned housing. The cases supply no authority for drawing such a distinction, and the distinction between new and used housing should not be determinative of the existence of an implied warranty of habitability but rather the relative positions of the parties to the sale of the house.

HUD next contends that it was under no duty to warrant that the premises were free from a lead paint hazard when it sold the home and insured the mortgage. Whether it was under such a duty or not is beside the point; whether it actually did make such a warranty is the issue.

■ As stated, the mortgage for the residence in question was insured by HUD pursuant to § 221(d)(2) of the National Housing Act. This states in pertinent part that the residence must meet "the requirements of all State laws, or local ordinances or regulations, relating to the public health or safety, zoning, or otherwise, which may be applicable thereto . . ." Therefore, by granting the mortgage, HUD impliedly warranted that the residence met the requirements of any such local ordinances. Philadelphia Health Code, § 6-403 is an ordinance prohibiting the presence of excessive levels of lead-based paint. Therefore, by granting the mortgage, HUD impliedly warranted the absence of excessive levels of lead-based paint on the premises.

Furthermore, § 185 of the HUD Handbook provides as follows:

*Repair and Maintenance Objectives.* The overall objective is to (a) place properties in first-class condition to create maximum sales appeal at the highest obtainable sales price in order to contribute to maintenance of a firm real estate market; (b) eliminate potential default hazard attributable to physical deficiencies; (c) eliminate all structural, (including termite infestation) mechanical and surface deficiencies which, if not eliminated, would result in major repair or replacement expenditures by the purchaser, or demands upon FHA under the terms of the warranty on the Sales Contract, Form 2384. Careful examination of operating systems under actual working conditions is essential to discovery and correction of latent defects. . . . Since it is of utmost importance to maintain public confidence, all reasonable effort must be exerted to place the property in first-class condition prior to sale."

Nevertheless, HUD argues that the above statement does not constitute a warranty, and that the Joint Statement Regarding Warranty signed by the Pages precludes any implied warranties. This statement provides in part:

"Your attention is invited to Item 11 on the reverse of the Agreement of Sale, which in essence provides a warranty that the property is structurally sound, and that the plumbing, heating and electrical systems are in reasonable operating condition, free of major defects for six months from the date of settlement. This six-month warranty covers only certain latent defects; it does not cover refrigerators, window type air conditioners, ventilating fans, laundry washers, dryers, dishwashers and waste disposers. The exception to the above is that "the gas or electric range is warranted for a period of 30 days from date of settlement. The purchaser is responsible for all maintenance items such as minor plumbing leaks, clogged drains, minor electrical and heating problems, stuck doors or windows, locks, loose floor or wall tiles, etc."

The Statement concludes:

"By signing this statement, the purchaser acknowledges that he has read

the agreement of sale, including Item 11, and this statement in their entireties, and the FHA will not be bound by other statements oral or written, not herein contained."

Thus the question has been narrowed down to the following: Does the implied warranty of habitability arise when the contract of sale states that the express warranties constitute the only warranties? In other words, was the implied warranty waived by the provisions above?

In a recent case, Smith v. Old Warson Development Company, 479 S.W.2d 795 (Mo.1972), the Missouri Supreme Court confirmed the existence of implied warranties in the sale of a new home. The Defendants in that case asserted that the contract language, "Property to be accepted in its present condition", was an exclusion of any warranties. The Court rejected such contention and held:

"We do not believe that a reasonable person would interpret that provision as an agreement by the purchaser to accept the house with an unknown latent structural defect." 479 S.W.2d at 800.

See Generally Annot. 25 A.L.R.3d 383.

The Federal Courts have implied warranties against the Government in numerous cases concerning the interpretation and construction of leases and contracts. In Hedin Construction Company v. United States, 347 F.2d 235, 171 Ct. Cl. 70, (1965), a contractor brought an action against the Government for breach of an implied warranty alleging damages for delay due to the Government's faulty specifications regarding the construction of a Veterans Administration Hospital. The Court held that the Government impliedly warranted that if Government specifications were complied with, satisfactory performance would result. The Court further held that "this rule rests on the presumed expertise of the government where it sees fit to prescribe detailed specifications". The Court rejected the Government's

contentions that clauses of the contract negated the implied warranty and held:

"This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. United States v. Spearin, *supra*, 248 U.S. 132, at 137, 39 S.Ct. 59, at 61, [63 L.Ed. 166] (Court footnotes omitted). Moreover, this implied warranty is not defeated by a contract clause permitting the prospective bidders to conduct independent subsurface investigations, if such explorations could not reasonably be completed before the bids were to be submitted. Fehlhaber Corp. v. United States, 151 F.Supp. 817, 138 Ct.Cl. 571, cert. denied 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957). (347 F.2d at 241)

See, United States v. Bostwick, 94 U.S. 53, 24 L.Ed. 65 (1877); Allied Contractors Inc. v. United States, 381 F.2d 995, 180 Ct.Cl. 1057 1967); Wunderlich Contracting Co. v. United States, 351 F. 2d 956, 173 Ct.Cl. 180 (1965); Patton v. United States, 139 F.Supp. 279 (W.D. of Pa. 1955); Riverview Properties v. United States, 102 F.Supp. 934 (M.D. of Pa. 1952).

■ It is important to remember that in determining liability in this matter, that the Government should not be placed in a "privileged" position. In Krupp v. FHA, 285 F.2d 833 (1st Cir. 1961), an action was brought for breach of contract concerning the sale of an FHA-owned apartment complex. The Court held:

"The district court appeared to have some feeling that disclaimer provisions in a government contract were to be more favorably construed because 'imposed to protect the public treasury'. When the Government goes into the market place it must go as everyone else. The public treasury may be protected by conditions imposed by Congress, or by lawful regulations, but if the matter is left to

154

contractual provisions and to the courts, all parties there must stand alike. (285 F.Supp. at 836)."

We agree with the reasoning in those cases which hold that an implied warranty arises despite the express warranties in the contract. Here we do not have a situation in which the buyer and seller deal at arms length, each with an equal means of knowledge concerning the matter of housing. The seller here is in the business of reconditioning and reselling houses to the public, and holds itself out as having the necessary expertise to do so in a way that is fit for human habitation. The seller has also demonstrated itself to be in a superior position to discover and remedy the lead paint hazard. It is not disputed that HUD, in 1969, was aware that lead paint could be hazardous and that the City of Philadelphia had passed an ordinance in 1966 concerning said hazards. Further, the Federal Government itself has recognized in countless documents the dangers of lead-based paint. For example, in 1967, a pamphlet published by the Department of Health, Education and Welfare began:

"Lead poisoning is a needless cause of mental retardation, other neurological handicaps and death among children."

Lin-Fu, Jane S. "Lead Poisoning in Children", 452—1967, Page i, (U.S. Dept. of H.E.W. 1967).

It is beyond doubt that HUD in 1969 was not only in a position to determine if lead paint existed in HUD acquired properties, but also to eliminate it if it did. However, in 1969, HUD had no procedures or regulations as to inspecting or removing lead paint on properties it acquired.

On the other hand, the Pages had never purchased a home before and were inexperienced in home inspection. At the time of the sale the Pages were totally unaware of the dangers of the lead-based paint. Further, they justifiably relied on the expertise of HUD as being able to recondition a home that would be fit for human habitation. In fact, we feel that the Pages are entitled to expect more from their own Government than they are from a seller dealing at arm's length. HUD is not selling houses for profit, but rather to provide "a decent home . . . for every American family". See 42 U.S.C. § 1441; 12 U.S. C. § 1701t; and Thorpe v. Housing Authority of Durham, 393 U.S. 268, fn. 37, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). By affirming the existence of an implied warranty of habitability, this Court is confirming the Pages' trust in their own Government to do what it promised, and to carry out its statutory goals.

II.

Since this Court finds that an implied warranty of habitability arose, has HUD breached this warranty by allowing dangerous amounts of lead-based paint to remain on the property?

In March of 1966, an ordinance was passed in the City of Philadelphia which recognized lead-based paint as a serious health hazard, § 6–403(4) of the Philadelphia City Code provides:

Where the Department determines that the presence of lead paint upon any premises creates a health hazard to children, it shall issue an order to the owner or occupant to eliminate the hazard in accordance with methods prescribed by regulations issued by the Department.

Further, § 7–506 of the City Code provides:

Whenever the Department finds that any dwelling constitutes a serious hazard to the health or safety of the occupants . . . . it shall designate the dwelling as unfit for human habitation.

In the present case, the Pages' property contains quantities of lead-based paint far in excess of the standards set by the Philadelphia Code and the regulations thereunder. The allegations to this effect which were made by the City of Philadelphia in its Complaint are not disputed by the Pages or by HUD. Also

not disputed is the City's allegations that because of this health hazard, the property is unfit for human habitation. The Pages' further state that these conditions existed at the time the Pages purchased their property from HUD.

There can be no question that lead-based paint is a serious health hazard. In November of 1970, Senator Ralph W. Yarborough, Chairman, Senate Subcommittee on Health, stated:

Lead-based paint poisoning is probably the most prevalent disease in society that we allow to exist, even though we know its causes. Every year, almost 200 children die from lead poisoning; 12,000 to 16,000 children are actually treated and survive, even though half of these children are left mentally retarded. Yet, only one out of 25 children is actually treated which means that almost 400,000 children may be poisoned annually, on the best estimates we can get.

*Lead-Based Paint Poisoning*, Hearing before the Subcommittee on Health of the Committee on Labor and Public Welfare, United States Senate, Washington, D. C., Page 1 (Nov. 1970)

Moreover, the Federal Courts have recently recognized the severe hazards of lead-based paint. On January 23, 1973, my very able and distinguished colleague, the learned Judge Van Artsdalen, in Coalition Against Childhood Lead Paint Poisoning v. Philadelphia Housing Authority, C.A. No. 72–1515, (E.D.Pa. Opinion filed March 12, 1973), issued a preliminary injunction against HUD enjoining them from selling federally owned properties intended for residential habitation until lead-based paint accessible to children was removed from the dwellings.

The Court in referring to HUD properties which contained lead-based paint accessible to children held:

The danger to the public health and general welfare from such HUD properties being placed in private hands for habitation by small children is immediate and continuing. (at 8)

The Court then concluded in its opinion:

Out to its bare bones, HUD contends that it should be permitted to continue to sell urban residential houses that it acquires despite the fact that the houses contain dangerous levels of lead-based paint accessible to small children, and despite the fact that the houses do not conform with City of Philadelphia, Department of Public Health regulations and are subject to condemnation by the Department of Public Health as unfit for human habitation, thereby subjecting the owners to fines and criminal penalties, without warning the purchasers of the situation—all because elimination of the hazard might cost an estimated high expenditure of $1200 per house which might not be recouped on re-sale. HUD further seeks moral justification on the basis of a housing shortage for low-income families.

To equate the admittedly real and grave danger of permanent brain damage to small children with the relatively modest additional cost of rehabilitating houses to free them from lead-based paint raises issues that no amount of rationalization or legal theory can justify on moral grounds. (at 15)

█ Because of this substantial violation of the Philadelphia Health Code, the declaration by the City that the property is unfit for human habitation, and the subsequent prosecution by the City of Philadelphia, this Court finds a breach of the implied warranty of habitability. HUD in this case has breached an implied warranty that the dwelling would be fit for human habitation.

### III.

Both the defendants (Pages) and the Third Party Defendants (HUD) have moved for summary judgment. Summary judgment can only be granted where there is no genuine issue of fact. F.R. Civ.P. Rule 56. As stated, there is no dispute that the Pages' house had exces-

sive levels of lead-based paint in violation of the City Code, that this hazard makes the property unfit for human habitation, and that these conditions existed at the time the Pages bought the house from HUD. On the latter point, HUD states in its Memorandum of Law p. 3. "There is no allegation that at the time of the sale the residence did not satisfy those requirements [of the City Code]". However, paragraph 13 of the Third Party Complaint states, "The lead paint hazard existed at the time of purchase by defendants Page, and had existed during the time HUD owned the property." In Gloria Page's affidavit, paragraph 7, she further asserts under oath that "between the time we purchased the property and when we were notified by the City of Philadelphia that our property contained lead paint, we did not paint our house." These statements are not disputed or contradicted by HUD. F.R.C.P. Rule 56(e) provides in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

See also First Nat. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 288–290, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968); Robin Const. Co. v. United States, 345 F.2d 610, 614–615 (3rd Cir. 1965); Dressler v. MV Sandpiper, 331 F.2d 130 (2nd Cir. 1964); Wright, Rule 56(e): A Case Study on the Need for Amending the Federal Rules, 69 Harv. L.Rev. 839 (1956); Note, Summary Judgment Under Federal Rule of Civil Procedure 56—A Need for a Clarifying Amendment, 48 Iowa L.Rev. 454 (1963).

In the present case, HUD has not, by affidavit or in any other way, contradicted or disputed the facts set out in the Page affidavit. It has not met its burden under Rule 56(e) of showing that there is any genuine issue of fact. Therefore summary judgment is proper and can be entered against it.