Lillie TECHER, Shirley Gordino, and Dorothy Graham, Individually and on behalf of those similarly situated, Plaintiffs,

v.

Patricia ROBERTS–HARRIS, in her capacity as Secretary of the United States Department of Housing and Urban Development, and Techni Co-op, Inc., Defendants.

Civ. No. N 78–484.

United States District Court, D. Connecticut.

June 28, 1979.

Michael O. Sheehan, New Haven Legal Assistance, New Haven, Conn., for plaintiffs.

Cheryl B. Wattley, Asst. U. S. Atty., New Haven, Conn., for Harris and H.U.D.

Herbert R. Scott, New Haven, Conn., for Techni Co-op.

## MEMORANDUM OF DECISION

DALY, District Judge.

### I. FACTS

Plaintiffs and the class they seek to represent are tenants at Oriental Masonic Gardens (OMG), a federally owned low-income housing project located in New Haven, Connecticut. Defendants are the Secretary of the Department of Housing and Urban Development (HUD) and its managing agent, Techni Co-op, Inc. Ironically, HUD subsidized the project pursuant to § 236 of the National Housing Act, 12 U.S.C. § 1715z–1

as an innovative solution to the housing need of low-income families. Shortly after construction, however, the inherent structural defects became apparent. The modular units, constructed without sufficient insulation, were unable to withstand the harsh northern climate. Lacking proper repair, the project deteriorated. In 1977, HUD became mortgagee in possession and one year later assumed ownership through strict foreclosure. *U.S.A. v. Oriental Housing Development Corp. & Oriental Masonic Gardens, Inc.,* Civil No. 77–112 (D.Conn. Dec. 11, 1978).

Despite HUD's control over the past two years, living conditions at OMG are intolerable.[1] Vacant, garbage filled units adjoin those which are occupied. Plaintiffs suffer water leakage, plumbing failures, exposed electrical wires, faulty heating, and rat and roach infestation.[2] HUD has failed to make the repairs necessary to remedy the situation. Nevertheless, it has denied plaintiffs' application for rent abatement. Plaintiffs, unable to relocate in the constricted housing market, have withheld rent as a last resort. HUD has responded by threatening some plaintiffs with eviction and actually instituting proceedings against others. At the pre-eviction administrative hearing, Techni Co-op informed individual plaintiffs that it lacks authority to consider the conditions at OMG as a basis for rent adjustment. Faced therefore with the prospect of imminent eviction, plaintiffs filed this instant lawsuit.[3]

1. Little improvement in conditions occurred even though the Secretary's statutory mandate to seek to better housing conditions for low-income groups does not evaporate when a § 236 project comes into his hands through foreclosure. *Cole v. Lynn,* 389 F.Supp. 99, 102 (D.D. C.1975)

2. At the evidentiary hearing on this motion, plaintiffs' testimony concerning the conditions at OMG was uncontroverted and the photographs submitted into evidence depicted vividly the complete disrepair.

3. In this regard, the experiences of Lillie Techer, one of the named plaintiffs, are typical. Techer, with her six children, originally moved into one apartment at OMG at 36 Lodge Street. Conditions became so unsafe that she moved to

a second OMG location. Rain leaked through the roof rendering her children's beds unuseable, the yard lacked drainage and was, therefore, perpetually flooded, and every night the rats and roaches would come into view. Techer paid Techni Co-op $800.00 of rent arrearage to obtain the right to move to the second apartment. She nevertheless faced the same conditions there. And in addition, windows did not close securely making the rooms so cold that they became unuseable. Nevertheless, plaintiff is reluctant to turn the heat too high in the rooms in which it works, since the roaches then move out into the rooms. Thus, Techer sought other housing but was unable to relocate in the constricted housing market. She then requested rent abatement from HUD. Although HUD has the statutory authority to

In their complaint, plaintiffs both individually and as class representatives essentially advance two claims. First, they contend that the limited pre-eviction administrative hearing fails to meet the due process requirements of the Fifth Amendment. Second, they assert that HUD's failure to repair the premises violates the National Housing Act, 12 U.S.C. §§ 1701 *et seq.* (National Housing Act), the National Housing Policies expressed in 42 U.S.C. §§ 1404a, 1441, 1441a, and 12 U.S.C. § 1701t (National Housing Policies), § 203 of the Housing and Community Development Amendments of 1978, P.L. 95–557 (Amendments), and Connecticut's laws governing the rights and responsibilities of landlord and tenant. C.G.S. §§ 47a–7(a) & 47a–4(c). Jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1337 & 1361. At this juncture, plaintiffs move for preliminary injunctive relief and certification of a class of similarly situated tenants.[4]

## II. MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

■ Plaintiffs ask this Court to enjoin preliminarily HUD from collecting rent while the unsafe and unsanitary conditions at OMG continue to exist.[5] They claim that an implied warranty of habitability exists in HUD leases pursuant to the National Housing Act, the National Housing Policies, the Amendments, and the applicable Connecticut statutes, C.G.S. §§ 47a–7(a) & 47a–4(c), and that HUD has breached this warranty by failing to maintain OMG in decent, safe and sanitary conditions.[6] Plaintiffs

---

abate rent when conditions at HUD projects materially threaten the health and safety of the tenants, it refused plaintiff's request. Finally, Techer against whom an eviction action has been filed, sought rent modification at the pre-eviction administrative hearing on the basis of the adverse conditions. In response, Techni Co-op simply stated that the only relevant issue was whether the rent had been paid. Consequently, Techer is engaged presently in defending herself in an eviction action in state court.

4. Plaintiffs ask ultimately for the following relief: (1) permanent injunction restraining the defendants from taking any actions without first affording plaintiffs an opportunity for a pretermination hearing; (2) permanent injunction restraining defendants from seeking to collect or demand any rent or seeking to evict tenants at OMG for any period of time in which defendants are in violation of Conn.Gen.Stat. § 47a–7(a); (3) an order requiring defendants to repair the premises at OMG so as to remove the materially dangerous conditions; (4) a declaratory judgment that demand for payment of rent from tenants at OMG during such period as defendants are in violation of Conn.Gen. Stat. § 47a–7(a) is in violation of certain federal housing statutes; (5) restitution of all rent collected during periods of time in which the defendants have failed to provide decent, safe and sanitary housing.

5. In their motion, plaintiffs sought as well to enjoin HUD from initiating eviction actions without first affording tenants a pretermination hearing where they could raise as a defense the adverse conditions of their tenancy. Although plaintiffs failed to present their request for relief in the alternative or to address the issue at all, it has become apparent to this Court that enjoining the collection of rent would effectively obviate the need for any pretermination hearing during the period of the injunction. Therefore, since this Court grants the primary relief sought, it finds no need to reach out at this time to address the merits of the alternative relief requested, particularly with respect to the issues raised in *Mixon v. Jones,* Civil No. N–76–409 (D.Conn. Aug. 31, 1977).

6. 12 U.S.C. § 1701t reads:

The Congress affirms the national goal, as set forth in section 1441 of Title 42, of "a decent home and a suitable living environment for every American family".

The Congress finds that this goal has not been fully realized for many of the Nation's lower income families; that this is a matter of grave national concern; and that there exist in the public and private sectors of the economy the resources and capabilities necessary to the full realization of this goal. The Congress declares that in the administration of those housing programs authorized by this Act which are designed to assist families with incomes so low that they could not otherwise decently house themselves, and of other Government programs designed to assist in the provision of housing for such families, the highest priority and emphasis should be given to meeting the housing needs of those families for which the national goal has not become a reality; and in the carrying out of such programs there should be the fullest practicable utilization of the resources and capabilities of private enterprise and of individual self-help techniques.

42 U.S.C. § 1441 reads in pertinent part:

The Congress declares that the general welfare and security of the Nation and the health and living standards of its people require . . . the realization as soon as feasible of the goal of a decent home and a suitable

also contend that there is a substantial likelihood of irreparable harm from further payment of rent because it appears that a private right of action for damages will be unavailable to recover the rental payments if plaintiffs prevail at trial. Defendants respond that an implied warranty of habitability does not exist in HUD leases and that the injury alleged fails to constitute irreparable harm.

To qualify for the relief requested, plaintiffs must meet the prevailing criteria in this circuit for issuance of a preliminary injunction. In *Caulfield v. Board of Education,* 583 F.2d 605, 610 (2d Cir. 1978), the Court made clear that a plaintiff must make

> a showing of possible irreparable injury *and* either (1) probable success on the merits *or* (2) sufficiently serious questions going to the merits to make them fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief. (Citations omitted).

*Id.* at 610; *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70 (2d Cir.

1979); *New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 750 (2d Cir. 1977); *Triebwasser & Katz v. American Telephone and Telegraph Co.,* 535 F.2d 1356, 1358–9 (2d Cir. 1976). With this standard in mind, this Court will examine plaintiffs' arguments in support of their motion.

### A. THE MERITS

First, if there is an implied warranty of habitability in HUD leases, it has been breached by HUD in this instance. The dampness resulting from the constant leakage, the danger presented by rodent infestation and live electrical wires as well as the garbage filled apartments comprise only some of the adverse conditions that materially threaten the health and welfare of the plaintiffs. Moreover, it is undisputed that the recent repairs undertaken by HUD have been ineffective. HUD has failed to provide plaintiffs with decent, safe and sanitary housing at OMG and, as a result, plaintiffs live in a government owned project which virtually is unfit for human habitation.

With the breach of the warranty evident, the critical issue before the Court is wheth-

living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth, and security of the Nation. . . .

42 U.S.C. § 1441a reads in pertinent part: (a) The Congress finds that the supply of the Nation's housing is not increasing rapidly enough to meet the national housing goal, established in the Housing Act of 1949, of the "realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family". The Congress reaffirms this national housing goal . . . .

(c) The Congress declares that if the national housing goal is to be achieved, a greater effort must be made to encourage the preservation of existing housing and neighborhoods through such measures as housing preservation, moderate rehabilitation, and improvements in housing management and maintenance, in conjunction with the provision of adequate municipal services. . . .

§ 203 of the Housing and Community Development Amendments of 1978, P.L. 95–557 reads in pertinent part:

The purpose of the property management and disposition program of the Department of Housing and Urban Development shall be

to manage and dispose of projects in a manner which will protect the financial interests of the Federal Government and be less costly to the Federal Government than other reasonable alternatives by which the Secretary can further the goals of—

(1) preserving the housing units so that they can remain available to and affordable by low- and moderate-income families;

(2) preserving and revitalizing residential neighborhoods;

(3) maintaining the existing housing stock in a decent, safe, and sanitary condition;

(4) minimizing the involuntary displacement of tenants; and

(5) minimizing the need to demolish projects. Notwithstanding the possibility of a federal warranty, plaintiffs contend that Connecticut's statutory warranty of habitability codified in C.G.S. §§ 47a–7(a) and 47a–4(c) is applicable here, and excuses plaintiffs' obligation to pay rent. The threshold issue of whether the Connecticut provisions are preempted by the scheme of national housing legislation—a position argued by the defendant—need not be addressed here since this Court finds that the implication of a warranty on the basis of the federal statutes and common law is sufficient in itself to meet the *Caulfield* test on the merits.

er an implied warranty of habitability does exist in HUD leases. This issue appears to be one of first impression in this Circuit. Numerous courts have found such a warranty in private residential leases. *See e. g. Javins v. First National Realty Corp.,* 138 U.S.App.D.C. 369, 482 F.2d 1071, *cert. denied* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).[7] However, the Seventh Circuit, the only court to address the question regarding HUD leases, departed from the prevailing trend and declined to find an implied warranty. It stated that the establishment of a warranty in HUD leases is best left to Congress. *Alexander v. United States Department of Housing and Urban Development,* 555 F.2d 166 (1977) *rev'd on other grounds,* 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979).[8] Nevertheless, the explicit statutory objectives of the National Housing Act and Policies and the underlying rationale behind the existence of the warranty in private residential leases support the existence of an implied warranty here and certainly present fair grounds for litigation concerning the issue. *Caulfield, supra.*[9]

Implication of a warranty of habitability is consistent with the goals that Congress has enunciated in the federal housing statutes. For nearly forty years, Congress unequivocally has stated that the primary goal of its national housing policy is to provide "a decent home and suitable living environment for every American Family, . . . ." 12 U.S.C. § 1701t; 42 U.S.C. § 1441. It consistently has expressed concern with the failure to meet the goal in a timely fashion and has emphasized the necessity for its prompt realization.[10] Moreover, Congress

---

7. The following fourteen courts have held that there is an implied warranty of habitability in residential leases: *Lemle v. Breeden,* 51 Haw. 426, 428, 462 P.2d 470, 472 (1969); *Javins v. First Nat'l Realty Corp.,* 138 U.S.App.D.C. 369, 370–371, 428 F.2d 1071, 1072–73, *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *Mirini v. Ireland,* 56 N.J. 130, 146, 265 A.2d 526, 535 (1970); *Kline v. Burns,* 111 N.H. 87, 92, 276 A.2d 248, 251–52 (1971); *Glyco v. Schultz,* 62 Ohio Op.2d 459, 461, 35 Ohio Misc. 25, 289 N.E.2d 919, 923 (Ohio Mun.1972); *Jack Spring, Inc. v. Little,* 50 Ill.2d 351, 366, 280 N.E.2d 208, 217 (1972); *Mease v. Fox,* 200 N.W.2d 791, 796 (Iowa 1972); *Boston Housing Auth. v. Hemingway,* 363 Mass. 184, 199, 293 N.E.2d 831, 848 (1973); *Foisy v. Wyman,* 83 Wash.2d 22, 28, 515 P.2d 160, 164 (1973); *King v. Moorehead,* 495 S.W.2d 65, 75 (Mo.App. 1973); *Derr v. Cangemi,* 66 Pa.D. & C.2d 162, 175 (1974); *Green v. Superior Court,* 10 Cal.3d 616, 629, 111 Cal.Rptr. 704, 712, 517 P.2d 1168, 1176 (1974); *Steele v. Latimer,* 214 Kan. 329, 336, 521 P.2d 304, 309–10 (1974); *Old Town Dev. Co. v. Langford,* 349 N.E.2d 744, 764 (Ind. App.1976); *contra, Thomas v. Roper,* 162 Conn. 343, 349–50, 294 A.2d 321, 325 (1972); *Blackwell v. Del Bosco,* 558 P.2d 563, 565 (Colo.1976).
The following three states have passed legislation creating a warranty of habitability: New York: N.Y. Real Prop. Law § 235–b (McKinney Supp.1977); Minnesota: Minn.Stat.Ann. § 504.-18 (West Supp.1977); Michigan: Mich.Stat. Ann. § 26,1109 (Callaghan 1970). Eleven states have passed the Uniform Residential Landlord and Tenant Act, section 2.104 of which creates a warranty of habitability in residential leases. The states which have passed the act are Alaska, Arizona, Florida, Hawaii, Kansas, Kentucky, Nebraska, New Mexico, Oregon, Tennessee, and Virginia. Uniform Residential Landlord and Tenant Act, 7 Uniform Laws Ann. 400 (Supp.1978). With respect to Connecticut, the legislature has codified a warranty of habitability in C.G.S. §§ 47a–4(c) and 47a–7(a) (West 1978).

8. It is interesting to note that the Court in *Alexander v. United States Department of Housing & Urban Development, supra,* was not faced with the question of injunctive relief as in the instant case but rather the appropriateness of ordering HUD to return to the plaintiff-tenants certain monies already paid to HUD. Thus, the adverse holding is less persuasive than it might otherwise be in that a different remedy is sought. *See* n. 14 *infra.*

9. Implicit in *Alexander, supra,* is the Court's recognition of the accepted principle that federal courts are free to shape a federal rule of common law, looking to state court decisions and Congressional declarations of policy as guides, even though in this instance it declined to exercise this prerogative. 555 F.2d at 167. For a discussion of the parameters regarding the creation of federal common law rules particularly in the context of implied warranties in HUD leases, *see Implied Warranty of Habitability in Federal Housing Projects,* 19 B.C.L.R. 343 (Jan. 1978).

10. In the Housing Act of 1937, 42 U.S.C. § 1401 (1970), Congress first set forth what proved to be the Congressional goal behind the national housing policy:
It is declared to be the policy of the United States . . . to remedy the unsafe and

has made clear that agencies subject to the relevant statutes, including HUD, have an affirmative obligation to act consistently with and in furtherance of the statutory purpose.[11]

In view of the explicit statutory language and relevant legislative history, courts have recognized that the language of National Housing Act & Policies "is not precatory;" and that "HUD is obliged to follow these policies." *Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 295, 501 F.2d 848, 855 (1974); *see also, Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Accordingly, HUD is mandated "to formulate and carry out a program reasonably calculated to provide a decent home and suitable living environment for every American family." *Brown v. Lynn,* 385 F.Supp. 986 (N.D.Ill.E.D.1974); *Housing Authority of Omaha v. U. S. Housing Authority,* 468 F.2d 1, 8 (8th Cir. 1972).

Employing this principle in *Philadelphia v. Page v. HUD,* 363 F.Supp. 148, 153, aff'd.

*on recons.* 373 F.Supp. 453, (E.D.Pa.1974), the court found that an implied warranty of habitability existed in a contract of sale of a residential home between HUD and its buyer which HUD had breached by selling the house with dangerous amounts of lead based paint. The court found that HUD had greater knowledge concerning housing than the buyer and was also in a superior position to discover and remedy the existing hazard.[12] The Court further stated that the implication of a warranty is particularly appropriate when HUD is the seller because it "is not selling houses for profit, but rather to provide 'a decent home . . . for every American family.' " (Citations omitted). 363 F.Supp. at 154.

The rationale of *Page, supra,* appears equally applicable where, as in the instant case, HUD acts as a lessor rather than a seller. In the private sector, the trend has been to graft the contractual principles of warranty onto the landlord-tenant relationship. In the landmark decision of *Javins v. First National Realty Corp., supra,* the

---

insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income . . . that are injurious to the health, safety, and morals of citizens of the Nation.

In 1949, Congress restated this goal in the Housing Act of 1949, 42 U.S.C. § 1441 (1970) and the Senate in its Committee report emphasized that "the general welfare and security of the Nation requires the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American." S.Rep.No.84, 81st Cong., 1st Sess., *reprinted in* (1949) U.S.Code Cong. & Admin. News pp. 1550, 1559.

In 1968, Congress, concerned that the goals had not been met adequately, enacted the Housing and Urban Development Act of 1968, 42 U.S.C. § 1441 (1970) and once again reiterated the housing policy set forth in the 1949 Act. *See* H.R.Rep.No.1585, 90th Cong., 2nd Sess., reprinted in (1968) U.S.Code Cong. & Admin. News p. 2873.

Most recently, Congress again demonstrated its concern with the failure to meet the goals established in 1949. 42 U.S.C. § 1441a(a) (Supp. IV 1974), and restated these goals in § 203(c) of the Housing and Community Development Amendments of 1978, P.L. 95–557.

For the relevant statutory language *see* n. 6, *supra.*

**11.** § 203 of the Housing and Community Development Amendments of 1978, P.L. 95–557 reads in pertinent part:

(a) It is the policy of the United States that the Secretary of Housing and Urban Development (hereinafter referred to as the "Secretary") shall manage and dispose of multifamily housing projects which are owned by the Secretary in a manner consistent with the National Housing Act and this section.

42 U.S.C. § 1441 reads in pertinent part:

The Department of Housing and Urban Development, and any other departments or agencies of the Federal Government having powers, functions, or duties with respect to housing, shall exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established . . ..

**12.** The court noted as well that "[t]he Federal Courts have implied warranties against the government in numerous cases concerning interpretation and construction of leases and contracts." *See e. g. United States v. Bostwick,* 94 U.S. 53, 24 L.Ed. 65 (1877); *Contracting Co. v. United States,* 351 F.2d 956, 173 Ct.Cl. 180 (1965); *Hedin Construction Company v. United States,* 347 F.2d 235, 171 Ct.Cl. 70 (1965).

court found that the essentially contractual nature of the urban residential leasehold, the unequal bargaining power between landlord and tenant, and the shortage of adequate housing all merited the implication of a warranty of habitability in urban residential leases.

The transformation of the urban leasehold recognized in *Javins* and its progeny pertains as well to OMG. *See Knox Hill Tenant Council v. Washington,* 145 U.S. App.D.C. 122, 448 F.2d 1045 (1971). Plaintiffs in this action are incapable of making the necessary repairs. Moreover, they are unable to relocate and, therefore, have little leverage in obtaining effective relief from HUD. These similarities argue against providing the HUD tenant with less legal protection than their private counterparts.

In fact, the existence of the explicit statutory mandate to provide decent, safe and sanitary housing together with the repeated Congressional concern over the failure to realize that goal in a timely fashion offers a convincing basis to adopt the *Javins'* holding as the federal common law rule. As the court aptly stated in *Page, supra,* "[b]y affirming the existence of an implied warranty of habitability, this Court is confirming . . . trust in . . . Government to do what it promised, and to carry out its statutory goals." 363 F.Supp. at 154. Thus, the existence of an implied warranty of habitability in HUD leases appears consonant with both the objectives of the relevant national housing legislation and the reality of the relationship between HUD and the plaintiffs at OMG.

However, even if the novelty of the issue of warranty in the federal housing context mitigates against a finding that probable success on the merits has been shown, there does exist a fair ground for litigation in light of the convincing reasoning of *Javins* and its progeny. And as required under

*Caulfield, supra,* the hardships resulting from HUD's failure to maintain OMG falls decidedly upon the plaintiffs. Existing on limited budgets of public assistance, plaintiffs, lacking affordable, alternative housing, must remain at OMG and suffer the intolerable conditions. The harm to plaintiffs resulting from payment of monthly rental without obtaining decent housing far outweighs the minimal effect upon HUD of foregoing these rental payments until it adequately repairs the premises.[13]

### B. IRREPARABLE HARM

The substantial hardship caused plaintiffs by paying monthly rental for inadequate housing will result in irreparable harm if they are unable through a private damage remedy under the National Housing Act to recover the payments should they prevail at trial. Traditionally, irreparable injury is defined as "injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, supra* at 72. Thus, this Court confronts the rather unique situation wherein the harm allegedly created—illegal collection of rent by HUD—is measureable in dollars and cents but arguably not recoverable in money damages. To determine the existence of irreparable harm this Court examines whether the implication of a private right of action for damages is likely under the National Housing Act.

In the absence of express statutory entitlement, the Supreme Court has delineated four factors to be considered in determining whether an implied private right of action for damages exists.

First, is the plaintiff 'one of the class[es] for whose *especial* benefit the statute was enacted' . . . . Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the

---

13. Lillie Techer receives $623.00 of AFDC benefits for herself and her six children. She spends $124.00 on rent. Shirley Gordino receives $485.60 for the benefit of herself and her 4 children. She spends $121.00 on rent. Dorothy Graham receives $548.98 AFDC benefits for herself and five children. She spends $124.25 on rent. Motion to Proceed In Forma Pauperis (Dec. 19, 1978). Thus rent comprises nearly one quarter of the named plaintiffs' limited income and irretrievable loss of that sum would have a substantially detrimental impact on these plaintiffs' financial situation.

plaintiff? And finally, is the cause of action one traditionally relegated to state law . . . .. (Citations omitted). *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). Considerations under the second factor alone militate against the implication of a damage remedy under the National Housing Act. There is apparently no indication in either the legislative history or case law that Congress desired to give private litigants a right to damages under the Act. In the absence of affirmative support in the legislative history, courts should be particularly reluctant to find an implied right to damages since in instances in which the national purse is involved "Congress, not . . . [the] federal courts, is the custodian." *U. S. v. Standard Oil Co.,* 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947); *see generally, Fuzie v. Manor Care, Inc.,* 461 F.Supp. 689 (N.D.Ohio E.D.1977). Thus, in *Davis v. Romney,* 490 F.2d 1360, 1372 (3d Cir. 1974), the court, citing the lack of a clear Congressional intent, denied the implication of a damage remedy under § 221(d) of the National Housing Act. Based upon the foregoing, there is a significant likelihood that at the conclusion of trial, plaintiffs will be unable to recover the monies paid out for the substandard housing.[14] By granting injunctive relief, the irreparable harm caused by the irretrievable loss of the rental payments will be prevented.

## III. MOTION FOR CLASS CERTIFICATION

■ Lastly, this Court finds that at this time provisional certification of a class of tenants at OMG is in order pursuant to F.R.Civ.P. 23(b). Tenants at OMG number approximately seventy-five and therefore, the numerosity requirement of the Rule is satisfied. The questions of law and fact—whether a warranty of habitability pertains to HUD leases and whether HUD has breached that warranty—are common to all tenants at OMG. Third, the named plaintiffs, represented by counsel particularly versed in the legal problems of the low-income tenant, will adequately represent the interests of the class. Fourth, the testimony at the hearing on the motion indicated that the adverse conditions cited by the named plaintiffs generally infect the entire project. However, recognizing defendants' objection that the evidence is insufficient to demonstrate conclusively that each tenant similarly is subject to these conditions, the certification granted here is provisional and without prejudice to the defendants' right to present further evidence in support of their objection.

## IV. THE REMEDY

In invoking its equitable powers, this Court is well aware of the accepted principle that "[i]njunctions . . . must be tailored to remedy the specific harms shown rather than to 'enjoin "all possible breaches of the law".' *Hartford-Empire Co. v. U. S.,* 323 U.S. 386, 410, 65 S.Ct. 373, 89 L.Ed. 322 (1945); *Swift & Co. v. U. S.,* 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905)." *Davis v. Romney, supra* at 1370. To protect the financial interests of both parties, the following preliminary injunctive relief is ordered: (1) the defendants are hereby preliminarily enjoined from collecting rent from the plaintiffs and the class they represent until it fulfills its legal obligations at OMG in accordance with the dictates of this opinion. (2) Plaintiffs and the class they represent are hereby ordered to pay into an

---

14. While injunctive relief may be appropriate in a given case, a remedy at law for damages may not. As the court noted in *Davis v. Romney, supra* at 1368,

> To secure relief on a claim at law, a plaintiff must, by definition, show that he has a "legal right." Thus one who seeks to secure damages for violation of a statute or a constitutional provision must demonstrate a legislative or constitutional intention that the provision relied upon protects the specific plaintiff

from harm and comprehends award of damages to him when such harm occurs. Where, however, equitable remedies are sought, there is no requirement that the plaintiff be invested with a legal right. Plaintiffs who satisfy constitutional and statutory standing requirements may obtain equitable relief against harm from administrative action even though the only legally protected interests are those of the public. (Citations omitted).

escrow fund established by this Court all monthly rent heretofore due and future rent due pending the outcome of this litigation.[15]

---

**15.** In this regard, *see* n. 8 *supra*.

Payment of back rentals in one lump sum understandably may impose a significant burden upon plaintiffs. Therefore, this Court encourages the parties to work out a mutually agreeable timetable for the periodic payment of back rent.